# United States District Court
## District of South Carolina

RECEIVED
USDC CLERK, COLUMBIA, SC
2021 APR 19 PM 4: 03

| | | |
|---|---|---|
| John David Padgett | ) | |
| | ) | |
| v | ) | Case Number:_____ |
| | ) | |
| City of Columbia, | ) | |
| City of Columbia Police Department, | ) | |
| Chief Holbrook, Officially and Personally, | ) | |
| Sgt. Brown, Officially and Personally, | ) | **COMPLAINT** |
| Officer Leach, Officially and Personally, | ) | |
| Officer Surles, Officially and Personally, | ) | |
| Officer Seavey, Officially and Personally, | ) | |
| Sgt. Baire, Officially and Personally, and | ) | |
| Investigator Seay, Officially and Personally. | ) | |
| | ) | |
| and | ) | |
| | ) | |
| several John Doe | ) | |

1. Plaintiff files this suit under Title 42 U.S.C. §1983:

   *Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State . . .subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action of law.*

2. Plaintiff believes that a citizen's rights to *due process* and to *equal protection* are secured by the U.S. Constitution and other federal law.

3. Plaintiff alleges that the Columbia Police Department has repeatedly—and without variation—willfully and purposely denied Plaintiff *equal protection* and *due process* over the course of a number of years.

4. Plaintiff believes that in all cases the individual officers have acted with the approval or at the direction of their supervisors, who Plaintiff believes are complicit

File: complaint 18 apr

5.  Plaintiff fully realizes that his description of events is so outrageous on the face of it that he could not expect anyone to believe him without convincing support.

6.  Plaintiff intends to rely primarily on the body camera video of the police officers to support his claims. Plaintiff will also rely on police incident reports, recordings of 911 calls, and other documentation that is currently controlled and maintained by the Columbia Police Department.

7.  Plaintiff believes that the body camera video will demonstrate that Plaintiff has presented all of the actions and words of the officers in the context in which they occurred, and that Plaintiff has not attempted to achieve greater effect by manipulating the contents or the contexts in any manner.

8.  Plaintiff's belief that he has no access to due process and no police protection did not come to Plaintiff only as an inference or only by way of intuition: in case Plaintiff might be slow on the draw, on 17 December 2020, Officer Seavey and Officer Searles spelled it out to him in plain language that Plaintiff believes their body cameras recorded.

9.  Plaintiff believes that in every situation the Columbia Police Department acted under color of law in every situation. Plaintiff believes that the officers were in uniform, were in vehicles that belonged to the City of Columbia, and were being paid by the City of Columbia.

10. Plaintiff believes that the Columbia Police Department has willfully refused or failed to formulate a policy to adequately train its officers on a citizen's right to due process and to equal protection, and that this failure or refusal to adequately train its officers in regards to due process and to equal protection represents the official policy of the Columbia Police Department as well as a *willful, deliberate indifference to the constitutional rights of citizens likely to be affected by such a policy.*

11. Plaintiff believes that neither equal protection nor due process is mentioned in the Columbia Police Department's written policies and procedures.

12. Plaintiff believes that the Columbia Police Department's officers receive no training on due process and on equal protection other than they may be mentioned during training.

13. Plaintiff believes that public schools teach all students about the rights to due process and equal protection.

14. Plaintiff believes that police officers either (1) know the law, or (2) should know the law, including the law regarding due process and equal protection.

File: complaint 18 apr

15. These officers are working in the field of law enforcement and they are aware—or should be aware—of the law, including rights secured by the United States Constitution.

16. Plaintiff states that the policies and procedures manual of the Columbia Police Department indicates that officers are required to swear to "uphold the Constitution of the United States."

17. Plaintiff believes that these officers were completely aware that they were violating Plaintiff's constitutional rights.

18. Plaintiff believes that the officers were not acting in good faith towards Plaintiff nor towards City Council, the Mayor, and the City Manager.

19. Plaintiff believes that the responding officers directly communicated with their superiors during the course of events and that the responding officers acted either at (1) the direction of their superiors, or (2) with the approval of their superiors.

20. Plaintiff believes that the higher ranking superiors of the officers create the *official policy* of the Columbia Police Department.

21. Plaintiff believes that the actions of the officers as described herein reflect the official, if unwritten, policy of the Columbia Police Department.

22. Plaintiff believes that at times two or more officers conspired to prevent another officer from performing his duties. Plaintiff believes the record itself strongly suggests some type of long term, ongoing conspiracy.

23. Plaintiff believes that the Columbia Police Department has consistently used highly improper profiling methods. Plaintiff believes that the Columbia Police Department maintains some type of highly improper database files on both the Plaintiff and on Plaintiff's friend, Ryan Marshall, and Plaintiff believes that time and time again, the officers have regarded their database information much more highly than the truth.

24. Plaintiff believes that the profiling method is based largely on socioeconomic class and that this profiling has contributed to, or resulted in, Plaintiff being denied due process and equal protection.

25. Plaintiff believes that the profiling method is almost identical to racial profiling because the standards for profiles most certainly result in a disproportional number of violations of the civil rights of African Americans.

26. Plaintiff even believes that the Columbia Police Department's profiling is, in fact, racial profiling that, in these modern times, is not strictly racial.

File: complaint 18 apr

27. Plaintiff believes that physical appearance is the primary defining factor in the profiling of the Columbia Police Department, just as physical appearance is the defining factor of racial profiling.

28. Plaintiff believes that .discrimination is based on appearance as an indicator of socioeconomic status.

29. Plaintiff believes that this profiling is a primary cause, perhaps even the only cause, of the persistent, long-term and ongoing conspiracy that has resulted in the ongoing violations of his constitutional rights.

30. Plaintiff believes that the Columbia Police Department has consistently demonstrated that socioeconomic status is a primary guiding principal, just as race has been a primary guiding principal in the past, and perhaps is still a primary guiding principal today.

31. Plaintiff alleges that at all times the Columbia Police Department has showed a clear bias based on its perception of socioeconomic status. Plaintiff believes that the Columbia Police Department has so clearly, consistently, and persistently demonstrated its bias to the point that this bias is much more a matter of fact than a matter for debate.

32. Plaintiff states that there is no way to appeal what Plaintiff believes to be the verdicts of the Columbia Police Department and no means for a victim to seek a review or an appeal.

33. Plaintiff believes that the Columbia Police Department has denied Plaintiff due process and equal protection by a number of methods:

   a. Not conducting a single investigations in accordance with the very sparse written policies and procedures of the Columbia Police Department,

   b. Not responding to a Plaintiff's 911 call on 17 December 2020, and

   c. Willfully refusing to maintain proper records.

34. Plaintiff believes that the Columbia Police Department demonstrates its bias in a number of ways that may or may not be specific violations of Plaintiff's civil rights. For example, Plaintiff believes that the Columbia Police Department generally includes the names of both parties on incident reports, except when the suspect is upper middle class.

35. Plaintiff believes that the Columbia Police Department has consistently violated Plaintiff's constitutional rights a number of times. Plaintiff describes a number of such instances in this Complaint.

File: complaint 18 apr

36. In this document Plaintiff describes a number events in which he believes that the Columbia Police Department has denied Plaintiff equal protection and due process.

37. The first series of incidents occurred between 2015 and 2020 at Plaintiff's home.

### INCIDENTS AT 3019-3021 KLINE STREET

#### SUMMARY

38. Plaintiff alleges that the Columbia Police Department has denied Plaintiff due process by condoning the repeated criminal destruction of his property by his father's widow, who holds a lifetime residency in the 3021 side of the duplex.

#### THE ISSUE OF OWNERSHIP

39. Plaintiff's father died in November 2007 and left ownership of 3019-3021 to Plaintiff in November 2007.

40. In the same will, Plaintiff's father left a "Lifetime Residency" to his widow, Brenda Padgett, for the 3021 side of the duplex.

41. Plaintiff lives on the 3019 side of the duplex.

42. Plaintiff states that the Richland County Treasurer holds Plaintiff alone responsible for all property taxes levied against 3019-3021 Kline Street. Plaintiff states that he alone has paid the approximately $2,500 yearly property tax.

43. Plaintiff states that the Columbia Police Department's Ordinance Division has held Plaintiff alone responsible for the upkeep of all outside areas at 3019-3021 Kline Street, including the front yard on the 3021 side of the duplex (Brenda's side).

#### BRENDA'S OUTRAGE

44. Plaintiff states that although he is certain that his father had told Brenda Padgett about his plans, on the day his father died, Brenda Padgett expressed outrage when she read the will.

45. Plaintiff states that Brenda Padgett and he family began to remove certain property that his father had left to Plaintiff even before his father was buried.

46. Plaintiff states that he took no action at the time because the value of property they removed before his father was buried was less than $5,000 and because he believed that his father would have told Plaintiff to take no action, in the interest of getting along.

47. Plaintiff states since his father died, he and Brenda Padgett have gotten along well most all of the time, but that Brenda Padgett is intermittently acts out in a very vicious manner toward Plaintiff by destroying or throwing away property that belonged to Plaintiff.

48. From 2007 through about 2014, Plaintiff believed that Brenda Padgett would eventually get over her resentment toward Plaintiff and that her criminal actions against Plaintiff would stop.

49. In about 2015, when Plaintiff came to believe that Brenda Padgett would never get over her resentment.  At the same time Plaintiff also came to believe that his father would want Plaintiff to take action.

50. Plaintiff told Brenda Padgett that he was going to begin to call the police when Brenda Padgett committed crimes against the Plaintiff's property.

51. Plaintiff states that Brenda Padgett is a generally law abiding citizen and he believed that his threat to call the police would stop her criminal behavior.

52. Plaintiff states that the incidents continued despite his threat to call the police.

### PLAINTIFF BEGINS TO CALL POLICE

53. Plaintiff states that he began to call the police in 2015, believing that the Columbia Police Department would maintain some type of record regarding the calls.

54. Plaintiff believed that he could most quickly stop her criminal behavior by reporting every single incident, no matter if the value of the property was small or not.

55. After a couple of years, and after calling the police a number of times, Plaintiff came to believe that the police were maintaining no record of her times.

### THE POLICE ARE NONRESPONSIVE

56. Plaintiff states that different officers would respond each time, and the situation was new to each officer, and that the officers responded as if the current call were the first call ever.

57. Plaintiff believed that because the Columbia Police Department was not making any record regarding the reason for the calls, the Columbia Police Department looked at each incident as if it were a single incident.

58. Plaintiff states that if the particular incident were the first instance of such destruction, Plaintiff would never have called the police at all.

59. Plaintiff states that her destructiveness had been ongoing for 7 years by the time Plaintiff first called.

File: complaint 18 apr

60. Plaintiff states that Brenda Padgett denied the crimes Plaintiff accused her of for awhile.

## BRENDA ADMITS TO HER CRIMES

61. But as time passed, Brenda Padgett became bolder and bolder about the admissions she made to the police.

62. At some point during 2017 Brenda Padgett began to admit to her criminal actions to the Columbia Police Department.  Each time she was not penalized in any manner.

63. At some point Plaintiff began to demand incident reports.  Most of the time the Columbia Police Department refused to write a report.

64. In November 2017 Brenda Padgett destroyed an ornamental plant that was planted outside of Plaintiff's door.  Plaintiff called the police

65. An officer responded.  Brenda Padgett admitted that she had destroyed the plant because, she told the officer, the plant was in her way.

66. Plaintiff demanded a police report and the officer did write a report.

67. Plaintiff obtained a police report and took the report to the City of Columbia's court division.

68. When Plaintiff presented the report to the courts division employee he was told that the officer had indicated on the report that Plaintiff should not be allowed to press charges.

## PLAINTIFF BELIEVES THE OFFICERS CONDUCTED TRIALS

69. Plaintiff states that Brenda Padgett would generally be very angry with Plaintiff at the time that Plaintiff called the police.  After a time or two of listening to Brenda Padgett carry on about him for quite a while in an outrageous and untrue manner, Plaintiff began to tell the officers, "Look, I am not going to just stand there and listen to her tell lies about me without responding, and you don't want she and I going back and forth, so I am not going with you to talk to her."  Each time the officer seemed glad that Plaintiff had kept away.  Plaintiff later came to realize that this was a serious mistake on his part.

70. Plaintiff believed that the Columbia Police Department had effectively conducted trials without Plaintiff being aware that a trial was being conducted.

71. Plaintiff believes that the situation should have been turned over to the courts.

## PLAINTIFF CONTACTS THE CITY MANAGER

72. Plaintiff emailed the City Manager and told her

File: complaint 18 apr

    a)   that Brenda Padgett admitted to cutting down his plant, and

    b)   that had the plant been in Brenda Padgett's way—she should have first contacted Plaintiff and asked Plaintiff to cut the plant before cutting the entire plant down, and

    c)   that if the plant had been in her way, she should have cut only the part of the plant that pointed toward the central walkway, but that Brenda Padgett cut down all of the plant, including parts that could not have possibly been in her way,

    d)   that he believed that it was incumbent on Brenda Padgett to take pictures of the plant, had the plant been in her way, before destroying the plant,

73. Plaintiff states that the City Manager responded and that several days later the police officer who had taken the report returned to Plaintiff's residence and gave Plaintiff another police report.

74. Plaintiff was highly impressed at the interest the City Manager and her assistant showed regarding this matter.

75. Plaintiff states that he took this new report to the courts division and was told the same thing he had been told earlier.

### PLAINTIFF GIVES UP

76. Plaintiff is not sure what happened, but he believes that the officer intended to give him a report that would allow Plaintiff to prosecute. Plaintiff assumes there was a mix up.

77. Plaintiff greatly appreciated it that the City Manager had taken time to look into this. Plaintiff states that he still appreciates the interest of the City Manager and her staff.

78. Plaintiff also believed that the City Manager has many more important things to do than to deal with Plaintiff regarding this matter.

79. And Plaintiff decided to just give up.

80. Plaintiff states that in 2018 Brenda Padgett destroyed many flowers that he had planted on 3 occasions, but that he did not call the police, though he does have photographs that document her destruction. Plaintiff had given up on the Columbia Police Department.

### OFFICER LEACH

81. However, in July 2019 Plaintiff decided to try once again.

82. On or about July 12, 2019 Plaintiff returned from Charleston to see that all of his flowers in the front yard had been mowed down, that his planter boxes had been put by the road, and that a political sign had been destroyed.

83. Plaintiff called the Columbia Police Department and Officer Leach arrived a few minutes later. Plaintiff states that this was the same Officer Leach that had detained Plaintiff and Ryan Marshall for over an hour a few days earlier when Plaintiff and Ryan Marshall were searching for one of Ryan's dogs..

84. Plaintiff states that his friend Ryan Marshall happened to stop by minutes after Officer Leach arrived with the dog that they had told Officer Leach we were looking for a few days earlier.[1]

85. When Plaintiff explained what had happened to Officer Leach, Officer Leach apparently found it impossible to believe that a 74 year old woman had maliciously cut down Plaintiff's flowers, and Officer Leach suggested that she had hired "some landscapers", and, unknown to Brenda Padgett the landscapers had mowed the flowers down.

86. Plaintiff states that when he pointed out to Officer Leach that landscapers usually know better to mow down flowers, his memory is that Officer Leach suggested that "Mexican landscapers" who did not know English might misunderstand directions.

87. Plaintiff states that Brenda Padgett had established a pattern of admitting to her crimes to the Columbia Police Department, and that Plaintiff believed that Brenda Padgett would tell the truth; namely, that she did it.

88. Plaintiff told Officer Leach that he believed that Brenda Padgett would admit to cutting down his flowers.

89. When Brenda did not answer Officer Leach's knock, Plaintiff called Brenda on the phone, and Brenda came out a minute or two later.

90. Officer Leach asked Brenda whether she had hired landscapers and whether the landscapers had cut down Plaintiff's flowers without her permission.

91. Plaintiff states that as Brenda began to nod her head up and down in response to the first half of his question, Officer Leach turned to Plaintiff as if to confirm that his prediction was confirmed.

### BRENDA ADMITS TO THE DEED

92. At that point Brenda Padgett stepped forward and said that she *herself had cut down Plaintiff's flowers*, approximately 200 Zinna plants that were in full bloom at the time, all on the 3019 side (Plaintiff's side) of the front yard. Ryan Marshall told Plaintiff that Brenda had seemed proud of her destructive act.

---

[1] Plaintiff and Ryan Marshall met Officer Leach a few days earlier when Officer Leach accused them of looking for vehicles to break into it. Plaintiff discusses this incident later in this document.

93. Plaintiff states that the only satisfaction that Brenda Padgett gets from her malicious acts is the sick satisfaction she derives from Plaintiff being aware that she did the deed; that is, she has established a pattern of wanting Plaintiff to know that she did the deed, a pattern that continues to this day.

94. Plaintiff states that he spoke with Officer Leach's supervisor, Sgt.Baire, the next day about the matter.  Sgt Baire stated that he and one of his supervisors were going to review the video.

95. Plaintiff states that he believes that, on the face of it, the act of cutting down another person's flowers indicates a very vicious nature.

96. Plaintiff obtained a copy of the police report the next day, and, incredibly, the police report indicated that Brenda Padgett had cut down the flowers to improve the appearance of the yards.

97. The next day Sgt Baire called Plaintiff and told Plaintiff that the supervisor decided not to press charges.  Plaintiff cannot remember the reasons that Sgt Baire explained to him.

### PLAINTIFF'S EXPLANATION

98. Plaintiff found it very difficult to believe that the Columbia Police Department was so gullible as to believe that cutting flowers down improved the appearance of a yard.

99. Plaintiff thought about it and realized that when Sgt. Baire and Sgt Baire's supervisor watched the video, the first thing they saw was the Plaintiff, who, at that time, had not had a haircut or shaved in since the previous November.

100. Plaintiff believes that Plaintiff's appearance is the only possible explanation of why the Columbia Police Department did not pursue this matter and in previous matters:  Plaintiff's physical appearance suggested that Plaintiff was not part of the *status quo*.

101. However, Plaintiff can't be certain of their motivations.

### PLAINTIFF'S PURPOSE

102. Plaintiff's purpose has always been to stop Brenda Padgett's vicious destructiveness.  Plaintiff believes that her arrest would stop her destructiveness, but Plaintiff believes that other methods are available to the Columbia Police Department.

103. As an example, Plaintiff believes that warnings of possible consequences by the police officers would have stopped her destructiveness.

104. Plaintiff has believed that her destructiveness would stop if he had ever been able to take her before a municipal judge even one time.

File: complaint 18 apr

105. Plaintiff has no doubt that a municipal judge would much better be able to sort through things than police officers because Plaintiff believes that Brenda Padgett is actually very transparent, even if she does appear to be much more a part of the *status quo* than Plaintiff does.

### THE ABSURDITY OF OFFICER LEACH'S CLAIMS

106. Plaintiff does not believe that cutting down flowers is a usual means to improve the yard.  Further, Plaintiff does not believe that the Columbia Police Department believes any such thing either.

### PLAINTIFF SPEAKS WITH SGT BAIRE

107. Plaintiff states that Sgt. Baire gave Plaintiff his direct mobile number and that a few days later Plaintiff called Sgt Baire and told Sgt Baire that Plaintiff believed that a reason that the Columbia Police Department had not put a stop to Brenda Padgett's destructiveness is because he believed that the Columbia Police Department was not maintaining any ongoing record of their calls to 3019-3021 Kline Street.

108. Plaintiff told Sgt Baire that he believed that if there a single police officer were aware of the total incidents—as if a single officer had responded to all of Plaintiff's calls—the Columbia Police Department would have long ago stopped her destructiveness.

109. Plaintiff states that Sgt Baire agreed to allow Plaintiff to keep Sgt Baire informed.

### OWNERSHIP AND CONTROL OF THE FRONT YARD

110. Plaintiff pays 100% of the property taxes and believes that Brenda Padgett's rights as a lifetime tenant are limited to the interior of 3021 Kline Street.

111. Plaintiff believes that he has full ownership rights of the entire front yard.

112. Plaintiff states that, in the fall of 2018, the Columbia Police Department Ordinance Enforcement Officer Stacy Harris held Plaintiff responsible for bringing the entire front yard into compliance with city ordinances.

113. Plaintiff denies that Brenda Padgett has any say-so over what Plaintiff plants—not even if Officer Leach's absurd claim that cutting down Plaintiff's flowers were true.

114. Plaintiff states that Officer Leach's report included several statements that Brenda Padgett told him as if Officer Leach had confirmed those claims as fact.  As an example, the report states that a specific neighbor had complained about the yard as if Officer Leach believed it was the gospel truth.

115. Plaintiff states that he does not believe that Brenda Padgett has never even spoken with this specific neighbor, but that Plaintiff has known her since 1992.  Plaintiff did not believe that he needed to ask this neighbor if she had spoken

to Brenda about the yard, but he did anyway, and she confirmed to Plaintiff that she had not.

116. Plaintiff states that Officer Leach's report sounds like he had actually confirmed her claims and that to him like a Court's statement of its findings rather than a police report.

117. Plaintiff states that if he had had any idea that Officer Leach were acting on the Court's behalf (without the Court's knowledge) and effectively conducting a trial in the field, in the same manner of Judge Dread, Plaintiff would have participated more fully in what Plaintiff would describe as a "kangaroo court".

118. Plaintiff believes that on the face of it, destroying someone's flowers is a very vicious act.

119. Plaintiff believes that the implied message of Officer Leach's conduct conveyed to Brenda the message that she could continue to commit crimes against Plaintiff with impunity, and that Officer Leach violated Plaintiff's due process.

120. Plaintiff states that he sent a letter to the Chief of Police after this incident, asking that Officer Leach's body camera video be preserved.

### BRENDA STATES HER INTENTION TO DESTROY PLAINTIFF'S FLOWERS AGAIN

121. Plaintiff states a few days later that Brenda Padgett came outside when Plaintiff was replanting seeds in the front yard.

122. Brenda Padgett asked Plaintiff what he was doing.

123. Plaintiff states that when he explained to her that he was replanting flowers, Brenda Padgett told him, "I'll just pull them up like I did the last times."

### SGT BAIRE'S REACTION

124. Plaintiff states that he called Sgt Baire on Sgt Baire's cell phone after speaking with Brenda and told Sgt Baire what she had said.

125. Sgt Baire told him that he would "personally" come over and arrest her if she pulled up any more flowers because, if she pulled up my flowers again, that he would be certain that her motivation was *malice*.

126. Plaintiff states that Sgt Baire expressed surprise—and doubt—when Plaintiff told him that he would be calling him in about a month.

127. Plaintiff explained to Officer Baire that Brenda always waited until Plaintiff's flowers were about to bloom or after they had begun blooming to pull them down. Plaintiff estimated that time to be about one month.

128. Plaintiff states that after he explained the timetable, Sgt Baire asked Plaintiff, "Are you sure about that?" When Plaintiff affirmed to Sgt Baire that he was sure, Sgt. Baire said, "Well, you know her better than I do."

129. Plaintiff believes that it was very difficult for Sgt Baire to believe that anybody could be so vicious as to act in the manner that Plaintiff described.

### BRENDA DESTROYS PLAINTIFF'S FLOWERS AGAIN

130. One month later Brenda Padgett pulled up all the flowers that Plaintiff had planted on the 3021 half of the front yard Brenda Padgett's side but that she had left the flowers on the 3019 side (Plaintiff's side) alone.

131. Plaintiff called Sgt Baire and, as Plaintiff remembers it, Sgt Baire scheduled an appointment at 2:00 pm the next day.

132. When Sgt Baire inspected the front yard, he said that he could not prosecute Brenda Padgett because she had pulled up flowers only on her side of the front yard that her part of the duplex is situated.

133. Even so, Plaintiff states that Sgt. Baire spoke with Brenda and that Brenda admitted to Sgt Baire that she had pulled the flowers up.

134. Plaintiff states that this time was the only time that Brenda Padgett had not destroyed all of the flowers in the front yard. Plaintiff finds it really odd that in this instance she had destroyed flowers only that Sgt. Baire said she had a right to destroy.

135. Plaintiff states that until that day, Sgt. Baire had said nothing about his belief that she had the right to destroy flowers on her side of the yard.

136. Plaintiff states that, in any event, she had certainly destroyed flowers on the 3019 side (Plaintiff's side) with complete impunity about one month earlier.

### SGT BAIRE BLAMES PLAINTIFF

137. Sgt Baire suggested that Brenda Padgett's action was a response to something that Plaintiff did to her. Plaintiff states that Sgt. Baire used the term *tit for tat*.

138. Plaintiff believes that if her destruction of Plaintiff's flowers were a response to some action Plaintiff had taken against Brenda, then Brenda's destruction equals *self help*, or *vigilante* action.

139. Plaintiff states that even if the situation were a 100% *tit for tat* situation, the Columbia Police Department had a duty to conduct itself as a proper police force and put a stop the *tit for tat* business.

140. Plaintiff told Sgt Baire that as far as Plaintiff knew, none of Brenda Padgett's property had ever turned up missing or destroyed. Plaintiff pointed to Brenda

Padgett's car and pointed out that not once had bricks been tossed through the windows of her car of the windows of her house.

141. Plaintiff pointed out that Brenda Padgett had not once called the police on him.

### SGT BAIRE'S ADMISSION

142. Plaintiff states that when Sgt Baire told him that the Columbia Police Department was not sure about Plaintiff's property rights because of Brenda's Lifetime Residency in 3021 Kline St.

143. Plaintiff told Sgt Baire that

    a)   Plaintiff pays100% of the property taxes, and that

    b)   in 2018 Columbia Police Department's Ordinance Enforcement Officer Stacy Harris had held Plaintiff specifically responsible for the upkeep of the lawn on the 3021 side (Brenda's side) of the front yard.

144. Plaintiff believes that the Columbia Police Department could easily have determined the law.

### CONSEQUENCES OF NOT KNOWING THE LAW

145. Plaintiff believes that police departments exist for the purpose of enforcing laws.

146. Plaintiff also believes that police departments are responsible learning the law when they do not know the law.

147. Plaintiff asserts that the Columbia Police Department has willfully decided *not* to determine what the law says regarding Plaintiff's ownership rights.

148. Plaintiff does not see how the Columbia Police Department could have possibly conducted proper investigations unless it was aware of the law.

149. Plaintiff believes that the Columbia Police Department's willful refusal to determine the law has resulted in an improper investigation.

150. Plaintiff believes that the Columbia Police Department's improper investigations resulted in a denial of Plaintiff's right to equal protection and of Plaintiff's right to due process.

151. Plaintiff believes that Sgt Baire admitted to Plaintiff that the Columbia Police Department denied Plaintiff due process and equal protection.

152. The Columbia Police Department cannot possibly provide equal protection or due process until it becomes aware of Plaintiff's rights as the owner of 3019-3021 Kline Street.

**OFFICER LEACH RETURNS**

153. A few days after Sgt. Baire's visit, Plaintiff realized that he had no report or record of the August incident, so Plaintiff asked that an officer be dispatched to his address.

154. Plaintiff states that Officer Leach arrived and that Plaintiff told Officer Leach what happened and asked for a report.

155. Plaintiff states that Officer Leach told Plaintiff *not to call the police again because*—according to Officer Leach—*Plaintiff was trying to harass Brenda Padgett.*

156. Plaintiff states that Officer Leach referred to him as a "problem".

157. Plaintiff noted that Officer Leach's attitude toward Plaintiff improved dramatically when Plaintiff told Officer Leach that Plaintiff paid $2,500 a year in property taxes.  Further, Plaintiff told Officer Leach that he believed he paid as much property tax or more than anyone who lived in that area where Officer Leach and his cohorts had detained Plaintiff and Ryan Marshall a couple of months earlier, and that Plaintiff believed that he had as much right to police protection as those people do.

158. Plaintiff believes that the Columbia Police Department has willfully refused to provide Plaintiff with the same due process and with equal protection that the Columbia Police Department provides to most everyone else by not conducting proper investigations, by improperly profiling Plaintiff.[2].

**OFFICIAL POLICY**

159. Plaintiff believes that Officer Leach and Sgt Baire conferred with their superiors about these matters, Plaintiff believes that Officer Leach and Sgt Baire's superiors create the official policies and procedures of the Columbia Police Department, and so Plaintiff asserts that the actions—and the inactions—of Sgt. Baire and Officer represent the official policy of the Columbia Police Department.

**PLAINTIFF SPEAKS WITH THE CHIEF**

160. Plaintiff states that in the spring of 2020, he called the front desk of the Columbia Police Department.  Plaintiff identified himself and explained the situation and asked to speak with someone about this matter.

161. Plaintiff states that after being on hold for a few minutes, Plaintiff heard someone say, "Holloway".

162. When Plaintiff confirmed that the Chief was on the phone with him, he apologized to the Chief and told the Chief that he knew that the Chief had

---

[2] Plaintiff discusses the specifics of his profile, as told to him by Officer Leach, later in this document.

many other more important matters to deal with than to talk about what Plaintiff was calling about.

163. Plaintiff states that the Chief said, "I am already on the phone" and instructed Plaintiff to state the reason that he had called.

164. While speaking with the Chief, Plaintiff came to believe that the Chief knew exactly who the Plaintiff was and that the Chief was familiar with the situation.

165. Other than that, Plaintiff's memory of this brief conversation is much too vague for Plaintiff to say anything else about this call except that he believes the Chief referred him to an attorney who Plaintiff believes was an assistant to the Chief.

166. The attorney's name was Jessica Magnum.

### PLAINTIFF EXCHANGES EMAIL WITH A CITY ATTORNEY

167. Plaintiff spoke with Ms. Magnum one time and sent 3 emails to between 2 July and 22 July 2020. Plaintiff states that he has retained those emails as well as Ms. Magnum's two responses.

168. In those three emails Plaintiff explained the issue of ownership and control of the front yard clearly.

169. In her response of 22 June 2020, Ms. Magnum says, "I simply don't have enough facts to make any determination about the validity or strength of your claims."

170. Plaintiff states that his 3 emails fully inform Ms. Magnum of the situation.

### PLAINTIFF BELIEVES THAT THE EMAIL CONFIRMS THAT THE COLUMBIA POLICE DEPARTMENT COULD NOT HAVE CONDUCTED A PROPER INVESTIGATION.

171. Plaintiff believes that Ms. Magnum's email also amounts to an irrefutable admission that the Columbia Police Department could not possibly have conducted a proper investigation.

### THEY NEVER EVEN ONCE WARNED BRENDA PADGETT

172. Plaintiff the Columbia Police Department never once warned Brenda Padgett of the possible consequences of her actions.

### "WARNINGS EQUAL HARASSMENT"

173. Plaintiff's purpose was to have Brenda Padgett's destructiveness stopped.

174. Brenda Padgett is a generally law abiding citizen. Plaintiff believes that citizens who are generally law abiding respond to police warnings.

175. Plaintiff states that in his email to Jessica Magnum of 3 June 2020, Plaintiff states that he had spoken with Sgt Morris during the previous week and asked that Brenda Padgett be warned of the possible consequences of her actions.

176. Plaintiff states that he told Ms. Magnum that Sgt Morris accused Plaintiff of asking Sgt. Morris to harass her.

177. However, in the same email, Plaintiff states a few days before his talk with Sgt Morris, Officer Self had warned Plaintiff.

### OFFICER SELF'S WARNING TO PLAINTIFF

178. Plaintiff states that about one week prior to his first email to Jessica Magnum, Plaintiff asked that an officer be dispatched regarding a dog's leash that Plaintiff believed that Brenda Padgett had thrown away.

179. Officer Self arrived at Plaintiff's residence awhile later.

180. Plaintiff's memory is somewhat vague but he believes that Brenda Padgett denied throwing away his leash.

181. Plaintiff states that Brenda Padgett asked Officer Self to tell Plaintiff that Plaintiff should not go into the trash container that Brenda claims as her trash contrainer.

182. Plaintiff admits that in the past he has found a number of items that belonged to him in Brenda Padgett's trash can.

183. Plaintiff states that Officer Self warned Plaintiff not to go into Brenda Padgett's trash container.

184. Plaintiff mentions this warning to Jessica Magnum in his email of 3 June 2020.

185. Plaintiff pays 100% of the property taxes and does not acknowledge that any trash containers belongs specifically Brenda Padgett, yet Plaintiff has been warned to stay out the trash containers.

186. Plaintiff believes that Officer Self's warning was entirely out of line and in direct contrast to the Columbia Police Department's refusal to issue any warning to Brenda Padgett.

### DOUBLE STANDARDS

187. Although Plaintiff has called the Columbia Police Department many times about Brenda Padgett's destructiveness, she was never once warned.

188. But on the very first instance that Brenda Padgett asked the Columbia Police Department to warn Plaintiff, the Columbia Police Department made that warning immediately.

File: complaint 18 apr

189. By Sgt. Morris's definition, the Columbia Police Department has harassed Plaintiff.

### POLICE EFFECTIVELY ENDORSE CRIMINAL ACTIVITY

190. Plaintiff states that the Columbia Police Department has never once expressed even the least degree of disapproval to Brenda Padgett regarding her criminal activities.

191. Plaintiff states that the long term, ongoing, complete absence of disapproval equals a tacit approval of all of Brenda Padgett's reported crimes.

192. Plaintiff states that by its tacit approval, the Columbia Police Department has also effectively endorsed or condoned the criminal activity of Brenda Padgett.

193. Plaintiff believes that he is worse off for having called the Columbia Police Department because he believes that the inaction of the Columbia Police Department has emboldened Brenda Padgett.

194. Plaintiff believes that both the founding fathers and the current population agree that the right to ownership of property is either sacred or close to it.

195. Plaintiff alleges behavior by the Defendants over an extended period of time and in the face of a topic as important to the American people as property ownership, falls within the realm of behavior that can properly be characterized as *conscious shocking*, in a constitutional sense.

196. Plaintiff believes that it was obligatory for the Defendants to avoid tacitly encouraging Brenda Padgett's crimes.

197. Plaintiff states that he believes that the Columbia Police Department's refusal to express even the slightest disapproval of her crimes at any time, including Officer Leach's refusal or failure to express disapproval of her crime on this evening, equals a tacit endorsement of her crimes and a violation of Plaintiff's right to due process.

198. The ongoing, long term tacit endorsement of the crimes of Brenda Padgett indicate that the Columbia Police Department was in no way neutral and was biased to the extent that it could not provide due process and equal protection.

199. Plaintiff believes that the tacit approval of crimes against the Plaintiff goes all the way up to the Chief of Police, and, as incredible as it sounds, Plaintiff believes that the Columbia Police Department's official policy targets Plaintiff specifically as a person who has no right to due process or to equal protection.[3]

---

[3] Plaintiff does not believe that he is citizen who is so targeted.

File: complaint 18 apr

200. Plaintiff believes that the Columbia Police Department continued to act according to this official policy in regards crimes against Plaintiff committed by persons other than Brenda Padgett.

# MAYS PARK, 11 NOVEMBER 2020

### SUMMARY

201. An apparently nonworking, well to do, and highly intoxicated Columbia attorney who lives across from the Mays Park tennis courts pointed a shotgun at Plaintiff and another tennis player without any provocation at approximately 8:55 pm on 11 November 2020.

202. Plaintiff alleges that he was denied due process and equal protection because of an investigation that was not conducted in good faith nor in accordance with the written policies and procedures of the Columbia Police Department.

#### PERSONS AND PLACES RELEVANT TO THE 11 NOVEMBER INCIDENT

203. *Mays Park* is a public park that is owned, operated, and controlled by the City of Columbia. There are two tennis courts at Mays Park. The tennis courts are equipped with lights that are controlled with a manual timer. Plaintiff frequently plays tennis at Mays Park, often with Ryan Marshall.

204. *Ryan Marshall* is 28 years old and is employed as a Sexton at Eastminster Presbyterian Church. Ryan Marshall has lived at 4008 Kilbourne Road for 19 years. Plaintiff believes that Ryan Marshall is the highest ranked player in the U.S. Tennis Association leagues in Columbia. Ryan Marshall has won several USTA state championships.

205. *David Massey* is a non-working, formerly very successful, prosperous 63 year old attorney who Plaintiff believes is currently licensed. Plaintiff believes that Mr. Massey specializes in automobile accidents. David Massey has lived across the street from the Mays Park tennis courts at 1523 Saramont Drive since August 2017.

206. *Summer Thompkins* is an attorney who Plaintiff believes works with David Massey and lives with David Massey on Saramont Drive along with a minor child approximately 10 years old.

207. *Saramont Drive* is part of, or borders on, an area that includes the largest and most expensive houses within Columbia.

208. David Massey and Summer Thompkins appear to be *upper middle class individuals* who drive two fairly new cars, one being a Porsche Carerra.

209. Plaintiff drives a 1997 Honda Accord.  Plaintiff believes that Mr. Massey and Ms. Thompkins economic circumstances appear to be far beyond the economic circumstances of Plaintiff or of Ryan Marshall.

<h3 style="text-align:center">MR. MASSEY'S HISTORY OF GUNPLAY</h3>

210. Plaintiff is informed and believes that David Massey has a history of gunplay that he believes that the Columbia Police Department is aware of or should be aware of.

211. Plaintiff states that on an evening in August 2017—approximately one week after Mr. Massey moved to Saramont Drive—Ryan Marshall called Plaintiff and told him that Mr. Massey, in an apparently drunken state, had threatened to kill him and another tennis player named Vic Reddy because Ryan's dog had entered Mr. Massey's yard.  Plaintiff told Ryan Marshall that it was not against the law to threaten someone's life.  Plaintiff believed at first that the threat was not serious but was only the talk of a drunkard.

212. Plaintiff told Ryan that there was really no point in calling the police over this because Plaintiff felt certain that the police would not even take a report.

213. Plaintiff states that as they continued to talk, Ryan Marshall mentioned that Mr. Massey had a gun in his hands.

214. Plaintiff became alarmed at the mention of a firearm and instructed Ryan Marshall to call the police immediately because Plaintiff believed that

    a. Mr. Massey would likely repeat such behavior in the future,  and that
    b. the Columbia Police Department would expect the incident to be reported.[4]

215. Plaintiff is informed and believes that Ryan Marshall called the Columbia Police Department regarding that threat and that the Columbia Police Department responded by sending an officer to speak with Ryan.

---

[4] At that time, Plaintiff actually believed that the Columbia Police Department would expect Ryan to report this incident.

File: complaint 18 apr

### FAILURE TO MAKE A REPORT?

216. Plaintiff believes—or at least hopes—that the Columbia Police Departments generally makes a record of all reports of AGGRAVATED ASSAULT.

217. Plaintiff does not know whether the Columbia Police Department

   a. did not make a report of this alleged felony, or
   b. made the report and later ignored it.

218. Plaintiff believes that this failure to make a report is consistent with the manner in which the Columbia Police Department dealt with the crimes of Brenda Padgett against Plaintiff.

### VIC REDDY NEVER RETURNS TO MAYS PARK

219. Plaintiff is informed and believes that Vic Reddy still lives in Columbia but that Vic Reddy has not returned to Mays Park since Mr. Massey threatened his life.

### MR. MASSEY SOON BECOMES FRIENDLY

220. As of the date of Mr. Massey's death threat, Ryan Marshall had recently been employed as a sexton at Eastminster Presbyterian Church on Trenholm Road.

221. Plaintiff states that within one week of Mr. Massey's death threat, Ryan Marshall told Plaintiff that he had seen Mr.Massey at Ryan Marshall's place of employment, Eastminster Presbyterian Church, where Ryan learned that Mr. Massey and Ms. Thompkins are members.

222. Plaintiff states that Ryan Marshall told Plaintiff that Mr. Massey behaved in an unusually friendly manner toward Ryan.  Plaintiff states that Ryan believed Mr. Massey behaved in such a friendly because he wanted his crime to be forgotten and that Mr. Massey did not want his death threat to become known at Eastminster Presbyterian.

223. Plaintiff states that between August 2017 and the date of filing, Plaintiff and Ryan Marshall saw Mr. Marshall at least once per week most every week and more often during most weeks.

224. Plaintiff states that up to 11 November 2020, Ryan Marshall frequently mentioned to Plaintiff that Mr. Massey was very friendly towards Ryan, whether he saw Ryan at the church or at the tennis courts.

225. Plaintiff states that he believes that Mr. Massey is generally a very personable character, and that he can be very likable.

226. Plaintiff states that at all times up to 11 November 2020, Mr. Massey has behaved in a friendly or in an inappropriate and *overly friendly* manner towards Plaintiff.

File: complaint 18 apr

227. Plaintiff states that his dog got into Mr. Massey's yard on one occasion and that, rather than pulling a gun on Plaintiff, Mr. Massey tearfully urged Plaintiff not to severely punish the dog.

228. Plaintiff states that during the summer of 2020, when Summer Thompkins and the minor child were throwing a baseball, Plaintiff stopped and threw the baseball for a few minutes with the minor child.

229. Plaintiff states that his last contact with Mr. Massey prior to 11 November 2020 was on October 31, 2020, when Mr. Massey, who was obviously having some cognitive problems, said, "I love you" to Plaintiff multiple times. Mr. Massey again had tears in his eyes.

230. Plaintiff states that after each such declaration, Mr. Massey said, "We need to take better care of each other."

231. Plaintiff believed that Mr. Massey's expressions of excessive affection were due to cognitive problems and to Mr. Massey's desire to get along and have the death threats forgotten.

232. Plaintiff states that Plaintiff and Ryan got along well with Mr. Massey on all occasions between August 2017 and November 2020. Plaintiff states that there was never an argument or disagreement.

233. Plaintiff states that both he and Ryan were content to let bygones be bygones, but Mr. Massey was to take on other ideas.

234. Plaintiff states that from about March 2020 through early November 2020 the lights at Mays Park were turned off by the City because of COVID.

235. Plaintiff states that on or about 25 October 2020 the lights came back on.

236. Plaintiff states that one or two nights after the lights had been turned back on, they were again turned off. Plaintiff states that Ryan Marshall told Plaintiff that he believed that a specific neighbor had called the City and complained about the tennis court lights and asked that the lights be turned back off.

237. Plaintiff states that because he knows this neighbor much better than Ryan does, Ryan Marshall asked the Plaintiff to see if the specific neighbor had complained. Plaintiff asked them and they told Plaintiff that, no, they had not complained.

238. Plaintiff states that he believes the lights were turned back on a few days later as a result of an email from a tennis player to his city council person.

### THE LIGHTS ARE VANDALIZED

239. Plaintiff states that at approximately 8:15 pm on 11 November 2020 and asked Plaintiff to meet him at the tennis courts at Mays Park.

240. Plaintiff states that when he arrived at the tennis courts at approximately 8:30 pm, Ryan Marshall told Plaintiff that he had just watched Summer Thompkins walk from her residence to the timer switch for the lights, and that he had watched Summer Thompkins disable the timer switch and walk back to the home she shares with David Massey.

241. Plaintiff states that he examined the timer switch and noticed that the knob was missing and that the lights could not be turned on.

242. Plaintiff states that he immediately assumed that Ryan Marshall's intuition about a neighbor complaining was correct.

243. Plaintiff states that he and Ryan Marshall conferred about whether to call the police or to attempt to resolve the matter without the police.

244. Plaintiff states they believed Mr. Massey's friendliness was motivated by a desire to settle the matter of the death threat between us, and to avoid having the death threat reported to the SC Bar and to Eastminister Church in addition to the report Ryan had made to the police.

245. Plaintiff and Ryan Marshall agreed that Mr. Massey and Ms. Thompkins had rather deal with Plaintiff and Ryan Marshall rather than the Office of Disciplinary Counsel at the SC Bar and the Columbia Police Department because neither Plaintiff nor Ryan Marshall had authority to sanction or to arrest anyone.

246. Plaintiff states that because Ryan Marshall believed that a neighbor had called city parks and complained about the lights and that Ryan Marshall was much more concerned with learning what Mr. Massey and Ms. Thompkins objected to regarding the lights than he was in anything else.

247. Plaintiff states that the reason Ryan Marshall wanted to know what they objected to was so that Ryan, Plaintiff, and other players could, if possible, address their objections and leave Mr. Massey and Ms.Thompkins without any objection regarding the lights.

248. Plaintiff explained to Ryan Marshall why he thought they should call the police, but that he agreed to go with Ryan.  Plaintiff and Ryan Marshall agreed that Ryan would do all of the talking because Ryan has spoken with Mr. Massey at greater length on more occasions than Plaintiff has.

249. Plaintiff states that he and Ryan considered the time and their knowledge of the habits of Mr. Massey and Summer Thompkins and concluded that a few minutes before 9:00 pm was not too late a time to knock on their door.

250. Plaintiff states that just before 9:00 pm Ryan Marshall rang Mr. Massey's doorbell one time.

251. Approximately one minute later Ryan Marshall told Plaintiff that he had seen Mr. Massey in the window and that Ryan Marshall said he was leaving.

252. Plaintiff states that he told Ryan Marshall that he was going to ring the doorbell one more time as Ryan Marshall began to leave.

253. Plaintiff states that when he rang the doorbell, Mr. Massey immediately screamed obscenities and death threats though the door along with instructions that we should leave his property.

254. Plaintiff states that he responded immediately to Mr. Massey's instructions to leave.

### MR. MASSEY'S GUNPLAY

255. Plaintiff states that as he continued to leave, Mr. Massey opened the door and pointed a shotgun at Plaintiff as Plaintiff continued to quickly leave.

### THE MINOR CHILD OBJECTS

256. Plaintiff states that the minor child ran out the door and shouted, "*Daddy, please don't shoot him!*"

### MR. MASSEY'S EXTENDED GUNPLAY

257. Plaintiff took cover behind a pine tree at Mays Park and called 911.

258. Plaintiff states Mr. Massey continued to point his shotgun and scream death threats for approximately 10 minutes.

259. Plaintiff states that the content of Mr. Massey's talk as well as the length of time that Mr. Massey stood there pointing his gun indicated to Plaintiff that Mr. Massey was experiencing significant cognitive problems.

File: complaint 18 apr

### OFFICER LEACH ARRIVES

260. Plaintiff believes that both Officer Leach and the other responding wore body cameras that were turned on as the officers first interviewed Plaintiff and Ryan Marshall and then Mr. Massey and Ms. Thompkins.

### OFFICER LEACH'S ATTEMPT TO JUSTIFY MR. MASSEY'S ACTION

261. When Plaintiff and Ryan told Officer Leach that Mr. Massey had pointed a shotgun at them, Officer Leach said that it was past the park's posted closing time of 9:00 pm, as if he believed that the time justified Mr. Massey's AGGRAVATED ASSAULT.

262. Plaintiff states that Ryan Marshall told Officer Leach that the time did not justify Mr. Massey's crime.

263. Plaintiff states that he believes that he told Officer Leach that it was before 9:00 pm when they knocked on Mr. Massey's door.

### MR. MASSEY'S STORY MATCHES PLAINTIFF AND RYAN'S STORY

264. Plaintiff states that heard much of the discussion between the officers and Mr. Massey and Ms. Thompkins as he stood and sat at the edge of the road, and that the facts that Mr. Massey and Ms. Thompkins presented to the officers matched what Plaintiff and Ryan Marshall had reported to the officers and what Plaintiff presents in this document.

265. Plaintiff states that he heard Mr. Massey and Ms. Thompkins affirm that Ryan Marshall and Plaintiff had left the property immediately when they were asked to.

266. Plaintiff, however, states that though Mr. Massey's presentation of facts matched Plaintiff and Ryan Marshall's, Mr. Massey's interpretation of the facts were much different from Plaintiff's.

### DELUSIONS

267. Plaintiff heard Mr. Massey claim that Plaintiff and Ryan Marshall were threatening him when they knocked on his, and Plaintiff heard Officer Leach explain to Mr. Massey that knocking on his door did not equal a threat.

268. Mr. Massey insisted that his house was under attack from "crazy people".

269. Mr. Massey seemed confused about a few things, including the time of day.

270. Mr. Massey seemed to believe that it were 4 o'clock in the morning rather than shortly after 9 pm.

271. Mr. Massey said, "We are the good guys.  We support the police."

272. Mr. Massey claimed to the officers that Plaintiff was threatening Mr. Massey at that moment, in full view of the officers as Plaintiff sat or stood by the edge of the road.

273. Plaintiff states that when Officer Leach asked Mr. Massey how the Plaintiff was threatening him, Mr. Massey gave no explanation.

274. Plaintiff states that he heard Officer Leach explain to Mr. Massey that Plaintiff was sitting (or standing) by the edge of the road threatening no one.

275. Plaintiff believes that the body camera video will confirm Plaintiff's memory that Mr. Massey twice accused the Plaintiff of threatening him while Plaintiff was standing or sitting and in full view of the officers,  To be clear, Mr. Massey claimed that Plaintiff was threatening him as the Plaintiff stood in full view of the officers, and that it was a case of Mr. Massey claiming that Plaintiff made threatening motions while the officers were not looking.

276. Plaintiff states that Mr. Massey again claimed that Plaintiff was threatening Mr. Massey at that moment, in full view of the officers as Plaintiff sat or stood by the edge of the road.

277. Plaintiff states that, once again, Officer Leach did not agree.

278. When Mr. Massey learned that Ryan Marshall's father was present, Mr. Massey threatened to sue Ryan's father based on the actions of his 28 year old son.

279. Though Mr. Massey could not state a single credible or reasonable threat that Plaintiff or Ryan Marshall posed to him, Mr. Massey repeatedly said, "I will stand my ground" and "I will defend my home."

### MR. MASSEY'S VIDEO

280. Plaintiff states that Mr. Massey told the officers that his home was under video surveillance.

281. Plaintiff has seen security company employees at Mr. Massey's house and believes that Mr. Massey's house is under video surveillance.

282. When the officers asked to see the videos, Mr. Massey told the officers that he would have to get the video from the security company.

283. *Plaintiff does not believe that officers of the Columbia Police Department ever saw the video.*

284. Plaintiff does not believe that the Columbia Police Department made any attempt to see the video.

### Mr. Massey's Intent to Call the Police Station

285. Plaintiff heard Mr. Massey tell the officers that he intended to call someone at the Columbia Police Department in the morning to discuss this matter.

### The Body Camera Video

286. Plaintiff intends to rely on the officers' body camera videos to demonstrate that Mr. Massey never mentioned any credible or reasonable threat made against him.

### Rage Over the Tennis Court Lights

287. Mr. Massey and Ms. Thompkins expressed rage over the lights at the Mays Park tennis courts.

288. When Mr. Massey and Ms. Thompkins were aware of the lights when they moved to Saramont Drive in August 2017.

289. Plaintiff states that, in response to COVID, the City turned off the tennis court lights and removed the hoops from the basketball courts in the spring of 2020.

290. Plaintiff believes that Mr. Massey and Ms. Thompkins must be looking of their windows to even know that the lights are on.

291. Plaintiff states that Mr. Massey frequently peeps out of windows.

292. Plaintiff assumes that after 9 or so months of seeing the lights turned off, Mr. Massey came to realize that he preferred to see no lights when he peeps out of his windows.

293. Plaintiff is not aware that Mr. Massey objected to the lights until the lights were turned back on.

294. The lights had been back on for several days when Ryan Marshall says he saw Summer Thompkins destroy the timer.

295. Plaintiff believes that the rage of Mr. Massey and Summer Thompkins demonstrated they had ample motive for destroying the light switch.

### Mr. Massey's Motivation for Committing Aggravated Assault

296. Plaintiff believes that that Mr. Massey's criminal behavior was motivated by fear of being confronted with Summer Thompkins crime.

### No Investigation

297. Plaintiff believes that the officers made no inquiry regarding the reported crime of Summer Thompkins.

File: complaint 18 apr

### OFFICER LEACH TELLS PLAINTIFF AND RYAN THEY WILL HAVE TO FIND ANOTHER PLACE TO PLAY TENNIS

298. Plaintiff states that Officer Leach told Plaintiff and Ryan Marshall that he had been on the radio speaking with his superiors about this incident.

299. Plaintiff states that Officer Leach told Plaintiff and Ryan Marshall that they were going to have to find another place to play tennis. Plaintiff believes that Officer Leach made this recommendation out of concern for Plaintiff and Ryan Marshall's safety.

300. Plaintiff states Officer Leach's expression of concern for the safety of Plaintiff and Ryan Marshall strongly suggests that

   a. Officer Leach believed that Mr. Massey had pointed a shotgun at them,
   b. Officer Leach believed that Mr. Massey was a dangerous person, and that
   c. Officer Leach believed that the Columbia Police Department would not pursue this matter.

301. Plaintiff states that he and Ryan Marshall told Officer Leach that they had no intention of driving to distant tennis courts. Both have played tennis at Mays Park for many years.

### DANGEROUS FOR THE PLAINTIFF AND RYAN MARSHALL ONLY?

302. Plaintiff believes that if Officer Leach considers the Mays Park tennis courts too dangerous for Plaintiff and Ryan Marshall to play on, then it would follows that Officer Leach would also believe those courts are too dangerous for anyone to play on.

303. If the Columbia Police Department believes Mays Park is too dangerous for Plaintiff to play in, then Mays Park is much too dangerous to have children playing in it.

### MR. MASSEY'S COGNITIVE ISSUES

304. Plaintiff states that when he told Officer Leach that he did not believe that Mr. Massey was of sound mind and that he believed that Mr. Massey should be examined by a mental health professional, Officer Leach asked Plaintiff, "Are you a psychiatrist?"

305. Plaintiff believes that any reasonable, reasonably intelligent, informed individual who watches the video will believe that Mr. Massey demonstrated that he was not of sound mind on 11 November 2020 and that Mr. Massey was potentially a great danger to himself and to others.

306. Plaintiff states that when Officer Leach denied that Mr. Massey was irrational, Ryan Marshall's father asked Officer Leach if Officer Leach believed that it was rational for an attorney to threaten to sue a grown man's father for actions of the grown man.

File: complaint 18 apr

307. Officer Leach did not agree that Mr. Massey had been irrational.

308. Plaintiff believes that any reasonable, reasonably intelligent, informed individual who watches the video will disagree with Officer Leach's assessment.

## THE INVESTIGATION

309. Plaintiff states that Officer Leach told Plaintiff and Ryan Marshall that an investigator would be calling *both* within a few days.

310. After not hearing from an investigator in 5 days, Plaintiff called the Columbia Police Department on 16 November 2020 and spoke with the Chief's assistant, Ms. Williams.

311. About one hour later, Investigator Seay of the Columbia Police Department called Plaintiff.  Plaintiff states that Investigator Seay seemed very irritated and that his tone was hostile.

312. Plaintiff states that he asked Investigator Seay if Investigator Seay had watched the body camera video of the two responding officers.

313. Plaintiff states that Investigator Seay affirmed that he had watched the body camera video.

314. When Plaintiff asked, Investigator Seay told Plaintiff that the Columbia Police Department had not yet determined whether to prosecute Mr. Massey.

## INVESTIGATOR SEAY ASKS, "WHO IS RYAN MARSHALL?"

315. When Investigator Seay asked Plaintiff to come to the police station to give a statement, Plaintiff told Investigator Seay that Plaintiff should bring Ryan Marshall along with him.

316. Plaintiff states that Investigator Seay asked, ***"Who is Ryan Marshall?"***

317. Plaintiff explained to Investigator Seay that Ryan Marshall was the individual standing beside Plaintiff in the body camera video, the individual who was as prominent in the videos as Plaintiff.

318. Plaintiff also explained that Mr. Massey had threatened to shoot and kill, and that Ryan Marshall was as much of a victim as Plaintiff was.

319. Plaintiff states that Investigator Seay asked Plaintiff what kin to Ryan Marshall.  Plaintiff told Investigator Seay that he and Ryan Marshall were not kin in any way.

320. Plaintiff asked Investigator Seay if Investigator Seay would email the incident report to Plaintiff.  Investigator Seay refused to email the report to the Plaintiff.

321. Plaintiff states that Investigator Seay proposed a meeting time of 2:00 pm on the following day, 17 November, in order that Plaintiff give Investigator Seay a written statement.

322. Plaintiff told Investigator Seay that he would contact Ryan Marshall and if Ryan was going to be available that he would see Investigator Seay then, but that if the time was not agreeable to Ryan, Plaintiff would call Investigator Seay and to reschedule.

323. Plaintiff states that after speaking with Ryan, he called Investigator Seay on the same day and told Investigator Seay that Ryan Marshall would not be available at 2:00 pm on 17 November.

324. Plaintiff states that Investigator Seay told Plaintiff not to worry with Ryan, but to come in alone and that Investigator Seay would meet up with Ryan later.

325. Plaintiff was puzzled by Investigator Seay's total lack of interest in Ryan Marshall.

326. Plaintiff was also puzzled because he felt that Investigator Seay was talking to Plaintiff in an irritated, hostile tone.

327. Plaintiff believed that Investigator Seay was speaking to Plaintiff as if Plaintiff were a suspected felon rather than a victim of a felony.

328. At this point Plaintiff began to seriously question whether Investigator Seay was dealing with Plaintiff in good faith.

329. .Plaintiff explained to Investigator Seay that the body camera video was much more compelling than anything Plaintiff could say or write in a statement.

330. Plaintiff explained exactly why the body camera video was much more compelling than any statement Plaintiff could make.

331. Plaintiff explained to Investigator Seay that if Investigator Seay had not made up his mind after viewing the video, Plaintiff could offer no information as compelling as the video.

332. Plaintiff also told Investigator Seay that Plaintiff had spoken with police officers as a witness and that Investigator Seay's manner was not at all like police officers who had spoken to him as a witness. Plaintiff explained to Investigator Seay that those officers were friendly, interested, and curious.

333. Plaintiff states that Investigator Seay demonstrated a remarkable lack of curiosity about what had happened on 11 November.

334. Plaintiff believes that Investigator Seay did not even try to disguise his lack of interest in this matter.

335. Plaintiff states that Investigator Seay told Plaintiff that he needed a statement in order to demonstrate to prosecutors that Plaintiff would cooperate and that Plaintiff would testify.

336. Plaintiff assured Investigator Seay that he would most certainly cooperate and that he would certainly testify if Mr. Massey were prosecuted.

337. Plaintiff states that Investigator Seay tone became even more irritable and hostile when Plaintiff explained to Investigator Seay that Plaintiff did not see any point in driving to the police station and giving a statement, but Investigator Seay never attempted to get Plaintiff to change his mind.

338. Plaintiff states that Investigator Seay never suggested that the Plaintiff was preventing the police from properly doing their work. Investigator Seay never suggested that Plaintiff was not doing his civic duty.

339. Plaintiff made a special point of explaining to Investigator Seay that if all Investigator Seay needed was a statement from Plaintiff in order to prosecute Mr. Massey, then Plaintiff would immediately give a statement.

340. Plaintiff asked Investigator Seay when he would decide what he was going to do. Investigator Seay told Plaintiff that Plaintiff did not set his time tables.

341. Plaintiff states that Investigator Seay called him the next day and told him that the Columbia Police Department was not going to pursue this matter.

342. When Plaintiff asked why, Investigator Seay told him he was closing the investigation because

      a)    the incident took place at night,
      b)    Mr. Massey was on his own property,
      c)    Mr. Massey believed that he was threatened, and
      d)    Plaintiff had not given a statement.

343. Plaintiff states that he questioned the point of giving a statement, but that he doesn't believe he ever refused to give a statement. .

344. Plaintiff states that any statement he makes would fully acknowledge that

      a)    the incident took place at night,
      b)    Mr. Massey was on his own property, and that
      c)    Mr. Massey believed that he was threatened.

345. Plaintiff states that if Investigator Seay actually believes those reasons are valid, then Investigator Seay would have to agree that he did not need a statement from the Plaintiff.

346. However, Plaintiff does *not* believe that Investigator Seay actually believes that any of those reasons justify the crime of aggravated assault.

### THE THREAT

347. Plaintiff agrees with Investigator Seay that Mr. Massey felt threatened. Plaintiff believes that Mr. Massey was threatened by the possibility of being confronted with Summer Thompkins' crime.

348. Plaintiff believes that an individual having cognitive difficulties might feel threatened for many unjustifiable reasons.

349. Though Investigator Seay claimed that Mr. Massey felt threatened, Plaintiff believes that Investigator Seay knew or could have known that no one in that house called 911 until 11 minutes after Plaintiff called.

### REGARDING THE BODY CAMERA VIDEO

350. Plaintiff reconsidered Investigator Seay's claim that he had watched the body camera video.

351. Plaintiff found it inconceivable that an investigator would claim to have watched a video that he had not watched.

352. But Plaintiff found it even more inconceivable that Investigator Seay could have watched the video and not know

    a)    who Ryan Marshall is, and
    b)    whether the Plaintiff and Ryan Marshall are kin or not.

353. Plaintiff believes that any reasonable, reasonably intelligent, and informed individual would agree that anyone who actually watched the video would most definitely know who Ryan Marshall was.

354. Plaintiff intends to rely on the video to demonstrate that anyone who watched even the first 5 minutes of the video would know who Ryan Marshall was.

### POLICY AND PROCEDURE

355. Plaintiff states that the written policies and procedures of the Columbia Police Department include the following statement:

> *Victims, complaints[5] (sic), and witnesses will be interviewed to assist in documenting statements for case preparation and additional information.*

356. Plaintiff is informed and believes that Investigator Seay never contacted Ryan Marshall. Further, Plaintiff believes that Investigator Seay never made any attempt to contact Ryan Marshall.

---

[5] "complaints" should be "complainants"?

357. Plaintiff believes that Investigator Seay denied Plaintiff due process by not conducting a proper investigation in accordance with the written, published policy and procedures of Columbia Police Department.

358. Plaintiff believes that Investigator Seay would never have contacted Plaintiff at all if Plaintiff had not spoken to the chief's assistant, Ms. Williams.

### FOLLUW UP ON MR. MASSEY'S SECURITY CAMERA VIDEO

359. On 11 November Mr. Massey told Officer Leach that he had surveillance cameras operating and that he could provide the video from those cameras later.

360. Plaintiff is informed and believes that Mr. Massey maintains video surveillance of his property at all times.

361. Plaintiff believes that the Columbia Police Department never asked for the videos that Mr. Massey claimed to have had.

### INVESTIGATOR SEAY'S QUESTION ABOUT KINSHIP

362. Regarding Investigator Seay's question about whether Plaintiff and Ryan Marshall were kin, Plaintiff notes that only Mr. Massey seemed to believe that it was significant or noteworthy that Ryan's father came to the park.

363. Plaintiff believes that had Investigator Seay had watched the video, he would not have asked if Plaintiff and Ryan Marshall were kin..

364. If Investigator Seay had watched the video, he would also have known that it was Ryan Marshall's father who asked Officer Leach about Mr. Massey's irrational statements

365. Specifically, Investigator Seay would have seen that after Officer Leach denied that Mr. Massey made any irrational statements, Ryan's father asked Officer Leach if it were rational for an attorney to claim that he is going to sue a grown man's father for the actions of his 28 year old son.

366. There was no mention of kinship in the officers' incident report, so Plaintiff suggests that the most likely stimulus behind Investigator Seay's question about kinship is Mr. Massey, who stated had his intention to call the police the next day, which was the 12th of November.

367. Plaintiff does not believe that Investigator Seay offered any valid justification for Mr. Massey's aggravated assault.

368. Plaintiff does not believe that Investigator Seay believes that the excuses he offered for Mr. Massey justify aggravated assault.

369. Plaintiff believes that the investigation was not only inadequate. Plaintiff believes that *there was no investigation at all*, not other than a discussion with Mr. Massey.

370. Plaintiff believes that Mr. Massey did call the police station and straightened things out just as he said he was going to on 11 November.

371. Plaintiff believes that Investigator Seay's sordid manner effectively confirmed to Plaintiff that Mr. Massey had indeed called the police department on 12 November and straightened everything out just as he said he would.

372. Investigator Seay

    a. apparently did not even look at the video,
    b. apparently never reviewed the 911 recordings,
    c. showed an incredible lack of knowledge, including not knowing who Ryan Marshall was,
    d. failed to try to follow up on Mr. Massey's videos, and
    e. never contacted Ryan Marshall, who is both a witness and a complainant

373. Plaintiff believes that any competent investigator who watched the video would most definitely take some kind of action to not only reduce risk to the public, but also to shield himself from taking full responsibility for the results of Mr. Massey's bizarre, delusional, cognitively challenged and potentially violent behavior, which Plaintiff was certain would continue.-

374. Plaintiff believes that Investigator Seay's willful and deliberate refusal to conduct—or even pretend to conduct—a proper investigation demonstrates a disgustingly vulgar and an absolutely unacceptable indifference to the safety of the public that Investigator Seay accepts paychecks to protect, including the children who play at Mays Park.

375. Plaintiff believes that aggravated assault is a felony.

376. Plaintiff believes that Investigator Seay acted either (1) at the direction of his supervisors, or (2) with the approval of his supervisors.

377. Plaintiff believes that Mr. Massey has significant personal relationships with ranking members of the Columbia Police Department. Plaintiff believes that such relationships may have influenced the manner in which the Columbia Police Department dealt with this complaint.

378. Plaintiff believes that the people of this country expect the police to investigate and to prosecute crime.

379. Plaintiff believes that Investigator Seay's words and behavior indicate that Investigator Seay endorses and condones Mr. Massey's felony.

File: complaint 18 apr

380.Plaintiff alleges that Investigator Seay's tacit endorsement of Mr. Massey's crime falls within the realm of behavior that can properly be characterized as *truly conscious shocking*, in a constit1utional sense

## PLAINTIFF'S REVIEW OF THE 911 CALLS

381.Plaintiff first requested copies of the 911 calls on 11 December 2020. Plaintiff believes that it is the Columbia Police Department's policy to respond to FOIA requests within 15 days.

382.Plaintiff states that, about 60 days later, on 15 February 20, he contacted the City Manager and his district city council person after he had not received any response.

383.Plaintiff states that a public information officer called Plaintiff within one hour and told Plaintiff that records indicated that his 911 calls were hang-ups; that is, nothing was recorded.

384.Plaintiff believes that except for the interference of the City Manager, he would never have seen the 911 calls.

385.Plaintiff told the information officer that his phone records would prove that his calls were not hang-ups.

386.Plaintiff states that he found the discussion most unusual, but that the information did locate the calls Plaintiff requested.

387.Plaintiff states that he has received a copy of three of the 911 calls he made on that evening, along with a copy of a 911 call made by Mr. Massey.

388.Plaintiff states that the first call is time stamped as beginning at 21:05:25, or 9:05pm and 25 seconds.

### MR. MASSEY CAN BE HEARD MAKING DEATH THREATS

389.On that recording Mr. Massey can be clearly heard screaming death threats.

390.Plaintiff made another call to 911 time stamped as beginning at 21:14:07, or 9:14pm and 7 seconds.

391.Plaintiff states that the activity log indicates officers arrived at 21:17:36, or 9:17 pm and 36 seconds.[6]

### MR. MASSEY CALLS 11 MINUTES AFTER PLAINTIFF CALLED

---

[6] Source: 62869.pdf, page 5 of 9 pages, as received from a city information officer,

File: complaint 18 apr

392. Plaintiff states that Mr. Massey's only call is time stamped as beginning at 21:16:54, or 9:16 and 54 seconds, or **42 seconds before officers arrived and 11 minutes after Plaintiff first called.**

393. On his call, at 30 seconds into the call, or at 9:17pm and 24 seconds—12 seconds before police arrived—Mr.Massey calmly completes this statement:

> **I have people that are trying to invade our house.**

394. When the operator asks for clarification, at 43 seconds into the call, or at 9:17pm and 37 seconds, Mr. Massey calmly completes the following statement.

> **There are people that are literally trying to break into our house and hurt us. Home invasion.**

395. Plaintiff believes that the police confirmed their arrival to the 911 center approximately 1 second earlier, at 9:17:36.

### Mr. Massey Continues to Make False Claims After Officers Arrive

396. At 51 seconds into the call, or at 9:17:45, or 9 seconds after the police have arrived, Mr. Massey completes the following statement:

> **I am trying to fight them off with my own weapons but I need help.**

397. At 1 minute and 2 seconds in to the call, or at 9:17:56, or 20 seconds after the police arrive, Mr. Massey begins this sentence:

> **We have a police officer that's showing up right now.**

398. Plaintiff believes that Mr. Massey was a little slow in seeing the police because he had stepped inside and because the police parked in front of the next door neighbor's home.

399. Because Mr. Massey did not see that the police had arrived, he did not know when to stop making false claims.

File: complaint 18 apr

# 911 Timetable Summary

| **Time** | **Before Officers Arrive** |
|---|---|
| 9:05:25 | Plaintiff first calls 911 |
| 9:14:07 | Plaintiff again calls 911 and remains on the phone with operators until officers arrive. |
| 9:16:54 | Mr Massey first calls 911 (over 11 minutes after Plaintiff called.) |
| 9:17:24 | *"I have people that are trying to invade our house."* |
| **9:17:36** | **Officers report their arrival to the 911 call center.** |

| **Time** | **After Officers Have Arrived** |
|---|---|
| 9:17:37 | *"There are people that are literally trying to break into our house and hurt us.  Home invasion."* |
| 9:17:45 | *"I am trying to fight them off with my own weapons but I need help."* |
| 9:17:56 | *"We have a police officer that's showing up right now."* |

File: complaint 18 apr

400. Plaintiff believes the body camera video of the police officers will show that both Plaintiff and Ryan Marshall were about 50 yards away from Mr. Massey's property line and about100 yards away from Mr. Massey's house when the officers arrived 8 seconds before Mr. Massey finished this statement:

**I am trying to fight them off with my own weapons but I need help.**

401. Plaintiff believes that had the Columbia Police Department spent 5 minutes reviewing these recordings, then the Columbia Police Department would see that Mr. Massey's claims cannot be reconciled with other known facts, such as the time the police officers arrived..

402. Mr. Massey mentions using "weapons" on the 911 call, but Plaintiff believes that Mr. Massey denied that he had pointed a gun.

403. According to Mr. Massey's version of events, in the face of his "weapons", Plaintiff and Ryan Marshall—in the face of Mr. Massey's weapons—continue to press forward with a home invasion, with no weapons,

404. Plaintiff believes that not only his claims should be fully investigated but also that Mr. Massey's claims should be fully investigated.

405. Plaintiff believes that it is unlawful for someone to make false claims to a 911 operator.

406. Plaintiff would be very surprised if anyone with Mr. Massey's cognitive problems could tell an internally consistent, coherent story. Plaintiff states that Mr. Massey's story was consistent only with the confused, irrational state of mind that Mr. Massey projected.

407. Plaintiff believes that Investigator Seay could easily have gotten to the truth if he had had any interest at all in determining the truth.

408. Plaintiff believes that the bias that the Columbia Police Department was even more pronounced one month later, again at Mays Park.


### THE INCIDENT AT MAYS PARK ON 17 DECEMBER 2020

Summary

409. Plaintiff calls 911 after Mr. Massey began screaming obscenities at Plaintiff at about 6 pm. Ryan Marshall and Ryan's girlfriend, Marie Folz. After about 15 minutes Ryan took Marie away from the tennis courts because she was in tears. After about 30 minutes Plaintiff realized that Mr.Massey should be evaluated by a psychiatrist and asked the 911 operator to send an ambulance.

When the ambulance arrived about 15 minutes later, the 911 operator told Plaintiff that the EMTs had requested that police officers be present before they exited the ambulance. Officer Seavey, Officer Surles, and a Trainee arrived about 10 minutes later, leaving Plaintiff to believe that the Columbia Police Department had ignored his call. Plaintiff remained on the line with the 911 operator from the time he first called until police officers arrived. After spending a few minutes talking with Mr. Massey, the EMTs declare that Mr. Massey does not need to be evaluated by a psychiatrist and the officers told Plaintiff that Mr. Massey claimed that Plaintiff had started the screaming match and that Mr. Massey voluntarily engaged in a screaming match with Plaintiff rather than calling 911 or just going inside. Officer Surles tells Plaintiff that he cannot play tennis at Mayes Park any longer because of Mr. Massey's threats. Officer Seavey tells Plaintiff not to call 911 if he again engages in a screaming. The officers decline to interview a neighbor who was a witness. Officer Seavey instructs Plaintiff not to call 911 in relation to any problem with Mr. Massey. The officers make no attempt to determine the truth and that their investigation was not in compliance with the Columbia Police Department's written polices and procedures. The officers were walking off when Marie Folz returned. Marie's return resulted in a major change in the manner in which the officers conducted themselves. Officer Surles told Marie that he was going to open up a case and asked her for a statement. Mr. Massey walks out into the yard and shouts obsenities towards the officers. Officer Surles written report acknowledges that Mr. Massey cursed at the police officers. Mr. Massey was not arrested or even warned for shouting obscenities at the police officers, who represent the Law.

### PLAINTIFF STATEMENT ON THE 17 DECEMBER 2020 EVENT

410. In the early evening on 17 December 2020 Plaintiff, Ryan Marshall and Marie Folz were hitting tennis balls on the Mays Park tennis courts when Mr. Massey walked outside and, *without the least provocation*, began to harass Plaintiff and Ryan Marshall by screaming obscenities directed at Plaintiff and Ryan Marshall from his front porch.

411. Plaintiff called 911 because of Mr. Massey's obscene statements and threats, which Mr. Massey delivered in a loud and boisterous manner.

412. Plaintiff states that the following statements are a sample of the statements—with obscenities omitted—that Mr. Massey repeated screamed:

    a.  "Ryan, you are the only person who is more sorry than my son."
    b.  "I hate you, Crazy Dave!"[7]
    c.  "I hate you Ryan."
    d.  "I hope you die."
    e.  "You should kill yourself."
    f.  "I know where you live."

---

[7] Plaintiff's middle name is David.

g.  "I have people ride by your house every day."

h.  "I am going to get you."

413. Plaintiff states that Marie Folz, who was visiting from Indiana, was sitting with her back turned to Mr. Massey when he began pouring verbal abuse on Marie, a person that Mr. Massey had never even seen before.

414. Plaintiff states that Marie began to cry as a result of Mr. Massey's abusive and obscene language, and that Marie also called 911.

415. Plaintiff states that Ryan Marshall did invite Mr. Massey to come over to the tennis courts.  Mr. Massey declined.

416. Plaintiff states that both he and Marie Folz urged Ryan to be quiet and that Ryan complied.

### MR. MASSEY THREATENS A YOUNG MOTHER

417. Plaintiff states that during Mr. Massey's obscene tirade, a neighbor, *a young mother of two boys,* walked outside of her house and asked Mr. Massey why he was behaving as he was.

418. Plaintiff states that Mr. Massey warned her to *"stay out of this so you don't get hurt"*.

419. Plaintiff believes that when anyone threatens the mother of a man's children and calls another man's girlfriend obscene names, the potential for violence increases not additively but multiplicatively.

420. Plaintiff believes that when an out of control individual with very clear cognitive issues is threatening the mother of a man's young children and is calling another man's girlfriend obscene names, the police should not delay in responding.

421. Plaintiff believes that both he and Marie Folz fully informed 911 operators of events as those events occurred.

422. Plaintiff believes that the 911 operators did inform the Columbia Police Department of what was going on.

### THE COLUMBIA POLICE DEPARTMENT'S DELAYED RESPONSE

423. Plaintiff states that after 15 or 20 minutes after he first called, Plaintiff asked the 911 operator when the police were going to arrive.

424. Plaintiff states that the 911 operator told him that Sgt Brown, the shift supervisor, had been made aware of his call.

### MARIE GIVES UP ON THE POLICE

425. After about 20 to 30 minutes or so from the time Plaintiff and Marie first called—and after one or more 911 calls made by Marie—Plaintiff states that Ryan Marshall and Marie completely gave up on the police and went to Ryan's home because Mr. Massey's language was frightening her and upsetting her.

### PLAINTIFF REALIZES THAT THE POLICE ARE IGNORING HIS 911 CALLS

426. Plaintiff states that he began to grow very alarmed when he began to realize that the police were ignoring their calls for help; however, Plaintiff remained at Mays Park because he wanted to be able to document the irresponsible, morally reprehensible, heinous act of the Columbia Police Department in ignoring a 911 call.

427. Plaintiff affirms that he is a law abiding citizen.  Plaintiff states that his last 911 call was on 11 November 2020 when Mr. Massey pointed a shotgun at him.  Plaintiff states that he has never abused the 911 call system.

### PLAINTIFF ASKS FOR AN AMBULANCE

428. After about 45 minutes, Plaintiff also came to realize that the Columbia Police Department had no intention of responding to his call for help.

429. Plaintiff then acted directly on his belief that Mr. Massey was a danger to himself and to others, and requested an ambulance so that Mr. Massey could be transported to a hospital in order that Mr. Massey be evaluated by a psychiatrist. .

430. After about another 15 minutes an ambulance arrived.

431. Plaintiff states that the 911 operator informed Plaintiff that the EMTs had requested that police be present and that the EMTs would remain inside the ambulance until the police arrived.

### OFFICERS RESPOND TO THE CALL FROM THE EMTS

432. Plaintiff states that after another 10 minutes or so Officer Seavey and Officer Surles, arrived, along with a trainee.

433. Plaintiff states that Mr. Massey continued to rant and rave until the officers arrived.

434. Plaintiff states that he believes that the officers arrived in response to the request from the EMTs.

### THE BIAS OF THE COLUMBIA POLICE DEPARTMENT

435. Plaintiff states that Officer Surles incident report implies that the officers had some difficulty getting Plaintiff's attention because Plaintiff was on the telephone when the officers arrived.

File: complaint 18 apr

436. Plaintiff states that he was still on the phone with the 911 operator when Officer Surles arrived. Plaintiff states that his attention was fully fixed on the officers when they arrived.

437. Plaintiff had stayed on the phone with the 911 center from the first time he called until the officers arrived, except for two or three times when the line dropped. Each time the line dropped, Plaintiff called 911 again immediately and was immediately connected.

### The Contempt of the Columbia Police Department

438. Plaintiff believes that the body camera video of the officers will demonstrate that the officers treated Plaintiff in a contemptuous manner.

439. Plaintiff had never seen the officers before that evening.

440. Plaintiff states that the officers gave him little time to explain anything.

441. Plaintiff states that he noted that the body cameras of the officers appeared to be turned on. Plaintiff intends to rely on that body camera video as support for his claims.

442. Plaintiff states that the officers and the EMTs walked across the street and went inside Mr. Massey's house, where they remained for several minutes.

443. Plaintiff states that as the officers and the EMTs were leaving, Mr. Massey walked outside with them.

444. Plaintiff heard Mr. Massey once again say that he would call the Columbia Police Department about this matter, saying, "I will call the Chief in the morning . . ."[8] Plaintiff could make out nothing after the word, "morning".

445. Plaintiff states that the EMT told Plaintiff that they were not going to take Mr. Massey to be examined by a psychiatrist.

446. Plaintiff asked the EMT if he could tell that Mr. Massey was drinking.

447. Plaintiff states the EMT said that Mr. Massey was not drinking.

### The Officers Blame Plaintiff

448. Plaintiff states that the officers told Plaintiff that Mr. Massey had told them that Plaintiff had started the verbal altercation and that Plaintiff had continued in the altercation the entire time. Plaintiff states that the video will demonstrate that the officers took Mr. Massey's word as if it were the gospel truth.

---

[8] Plaintiff has no idea whether or not Mr. Massey knows the chief.

File: complaint 18 apr

### THE REASON PLAINTFF REMAINED ON THE LINE WITH THE 911 CENTER

449. Plaintiff states that he had remained on the phone with the 911 operators the entire time for one reason only: to be able to prove that he had not been in a screaming match with Mr. Massey.

### THE MEANING BEHIND THE OFFICERS' CLAIM

450. Plaintiff notes that the officers' claim—if true—would mean that Mr. Massey had, for more than 45 minutes voluntarily screamed obscenities back at the Plaintiff rather than calling 911 or just walking inside and closing the door.

451. Plaintiff questions whether persons who are of sound mind would stand on their front porch and scream obscenities back at someone for over 45 minutes rather than calling 911 or just walking inside.

452. Plaintiff believes that such behavior indicates a high degree of hostility and is entirely consistent the behavior of someone who has committed AGGRAVATED ASSAULT one month earlier.

453. Plaintiff believes that the behavior that Mr. Massey himself reported to the officers indicate

    a. strong anti-social tendencies,
    b. an abnormally high level of hostility, and therefore
    c. an abnormally high potential for violence.

454. Plaintiff believes that the high potential for violence on 17 December is consistent with Mr. Massey's crime of AGGRAVATED ASSAULT on 11 November.

455. Plaintiff believes there was much more credible evidence that Mr. Massey should be examined by a psychiatrist than that Mr. Massey should not.

456. Plaintiff states when he inquired of Lt. Wilson of Richland County Emergency Medical Services, Lt. Wilson told Plaintiff that the EMS records state that the call was "cancelled by law enforcement".

457. Plaintiff believes that the Columbia Police Department's cancellation of the call was not because of Mr. Massey's soundness of mind, because Plaintiff believes that Mr. Massey had amply demonstrated the following to the officers:

    a. strong anti-social tendencies,
    b. an abnormally high level of hostility, and therefore
    c. an abnormally high potential for violence.

458. Additionally, the officers knew that Mr. Massey is alleged to have committed AGGRAVATED ASSAULT on 11 November 2020 and during the month of August 2017.

459. Plaintiff believes that the Columbia Police Department had no legitimate reason for canceling his request that Mr. Massey be evaluated by a professional who is trained to make such evaluations.

### THE REALITY IS EVEN WORSE

460. The police officers could have easily determined that Mr. Massey did a bit worse than what he admitted to the officers that he screamed threats for 45 minutes.

461. Plaintiff believes that the officers could have easily determined that—outside of Ryan Marshall's limited responses—nobody was screaming at Mr. Massey:

462. Plaintiff states that the officers took Mr. Massey's word as if it were the gospel truth and told Plaintiff that Mr. Massey had only responded in kind to insults from Plaintiff.

463. Plaintiff believes that if the officers had had any interest in determining the truth of what happened, they could have interviewed a witness, the young mother who lives next door to the tennis courts.

### OFFICER SURLES BEGINS TO WARN PLAINTIFF

464. Plaintiff states that Officer Surles warned, or began to warn, Plaintiff that he would be arrested if Plaintiff trespassed on Mr. Massey's property. Plaintiff interrupted Officer Surles and told Officer Surles that Plaintiff did not care to hear that.

### OFFICER SURLES CONCURS WITH OFFICER LEACH

465. Plaintiff states that Officer Surles told Plaintiff that Plaintiff would have to find another place to play tennis.

### OFFICER SURLES' ENDORSES MR. MASSEY'S THREATS

466. When Plaintiff asked why, Officer Surles told Plaintiff that was because Mr. Massey knew Plaintiff's name and where Plaintiff lives.

467. Plaintiff believes that Officer Surles explicitly condoned Mr. Massey's threats and indicated that the Columbia Police Department would take no action against Mr. Massey for carrying out those threats.

468. Plaintiff believes that Officer Surles and Officer Seavey's behavior enhanced the danger to Plaintiff by implicitly and explicitly affirmatively condoning Mr. Massey's violence in the past and by implicitly and explicitly condoning and encouraging Mr. Massey's threats.

469. Officer Surles apparently believed that Mr. Massey was a danger to Plaintiff, Officer Surles recklessly disregarding the safety of the public by canceling a call to have Mr. Massey interviewed by a psychiatrist.

### OFFICER SURLES' DOUBLE STANDARD

470. Plaintiff states that Officer Surles repeated Mr. Massey's threats to Plaintiff, but Plaintiff does not believe that Officer Surles warned Mr. Massey of the consequences of such action in the same manner that Officer Surles warned Plaintiff about trespassing on Mr. Massey's property.

471. Plaintiff believes that Officer Surles double standard further encourages Mr. Massey's violence/

### MORALLY REPREHENSIBLE

472. Plaintiff believes that Officer Surles's repetitions and effective endorsements of Mr. Massey's threats to Plaintiff are not only violations of Plaintiff's right to equal protection and to due process, but are also unconscionable and morally reprehensible.

473. There was no issue of Plaintiff trespassing on Mr. Massey's property. Plaintiff had not trespassed nor had he threatened to trespass on Mr. Massey's property, yet Officer Surles was compelled to warn Plaintiff about trespassing.

474. Plaintiff believes that Officer Seavey and Officer Surles did not believe that Plaintiff had engaged in screaming violent threats back at Mr. Massey because Plaintiff believes that the officers would certainly have warned Plaintiff of the consequences of acting violently against Mr. Massey.

475. Plaintiff believes that the body camera video will indicate that the officers' only warning was a warning to Plaintiff about trespassing.

### OFFICER SEAVEY TELLS PLAINTIFF NOT TO CALL 911

476. Plaintiff states that Officer Seavey told Plaintiff not to call 911 if he started another screaming match with Mr. Massey.

477. Plaintiff states that Officer Seavey's directive is completely consistent with the Columbia Police Department's ignoring of his calls earlier that evening.

478. Plaintiff believes that Officer Seavey had no legitimate reason to direct Plaintiff not to call 911 and that this directive violates Plaintiff's right to due process and to equal protection.

### PLAINTIFF BELIEVES THAT THE COLUMBIA POLICE DEPARTMENT HAD ALREADY ADOPTED A POLICY OF IGNORING PLAINTIFF'S 911

479. Plaintiff believes that Officer Seavey's directive equals a directive to never call 911 as Plaintiff had not engaged in any screaming match with Mr. Massey.

480. Plaintiff states that he believes that Officer Seavey was speaking on behalf of his supervisors. Plaintiff believes that Officer Seavey's supervisors set the official policy and procedures of the Columbia Police Department.

File: complaint 18 apr

481. Plaintiff believes that the official policy of the Columbia Police Department is set by the same supervisors who Plaintiff's 911 call.

482. Plaintiff believes that Officer Seavey was informing Plaintiff of the Columbia Police Department's official policy and position that Plaintiff has absolutely no police protection and that Plaintiff's 911 would be ignored in the future just as Plaintiff's 911 calls were totally ignored on the evening of 17 December 2020.

483. Plaintiff states that on 17 December 2020, his last call to 911, on 11 November 2020 was because Mr. Massey was pointing a firearm at Plaintiff. Plaintiff finds it especially galling that the Columbia Police Department ignored his call on 17 December.

484. Plaintiff does not believe that Sgt. Brown would have held Plaintiff's 911 call unless Sgt Brown's supervisor directed Sgt Brown to ignore the call or Sgt Brown's supervisor were in agreement with the call being held.

### PLAINTIFF TOLD HE SHOULD NOT EVEN BE AT MAYS PARK

485. Plaintiff states that he believes Officer Surles began to tell Plaintiff that Plaintiff cannot justify his presence at Mays Park

486. Plaintiff states that Officer Surles told Plaintiff that Plaintiff did not know what the people who live around Mays Park are like.

487. Plaintiff believes that Officer Surles was referencing the socioeconomic status of the people who live around Mays Park, which Officer Surles apparently believed was far above Plaintiff's socioeconomic status.

488. Plaintiff states that he believes Officer Surles was stating the official position of the Columbia Police Department.

### THE OVERRIDING CONSIDERATION OF THE COLUMBIA POLICE DEPARTMENT

489. Plaintiff believes that, in every single situation described in this complaint, the Columbia Police Department consistently and without fail based its decisions on the perceived socioeconomic status of the parties involved.

490. Plaintiff deeply regrets that he interrupted Officer Surles by telling the two officers some facts of his financial situation, including the fact that Plaintiff pays $2,500 a year in property taxes, which might be more than Mr. Massey pays.

491. Plaintiff states that he believes that according to the United States Constitution, the right to due process and to equal protection is in no way based upon a person's economic status or race.

### COLUMBIA'S HISTORICAL, LONG TERM FIGHT WITH FEDERAL LAW

492. Plaintiff wants to make it clear that he has lived in Columbia since he moved here—from Augusta, Ga—when he was 6 years old and that he does not care to live anyplace else.

493. Plaintiff notes that the City of Columbia has a long, sordid, and self-defeating history of fighting the complete implementation of the 14th Amendment to the Constitution.

494. In Plaintiff's lifetime, Plaintiff has also always disagreed with the City's fight with federal law.

495. Plaintiff remembers that the federal government demanded that the City open its public parks to persons to everyone without regard to race or socioeconomic class in 1965 or 1966.

496. Plaintiff remembers that the City of Columbia shut down its parks and kept the parks closed for a number of years rather than open the parks to all persons of all socioeconomic classes and races.

497. Plaintiff believes that Officer Surles's statement either springs from or closely parallels the exact sentiment that led the City of Columbia to close the parks in 1965 or in 1966.

498. Plaintiff believes that even at this late date, it is the official policy of the Columbia Police Department to continue to strongly resist equal access to due process and to equal protection.

499. Plaintiff believes that Officer Surles, Officer Seavey, and the entire Columbia Police Department is aware—or should be aware—that in the United States the rights to due process and to equal protection are secured not by economic status, but by the United States Constitution.

500. Plaintiff believes that it is really hypocritical for the officers of the Columbia Police Department to swear to protect the U.S. Constitution when the official policy of the Columbia Police Department is to not protect all of it.

#### OFFICER SURLES DENIES THAT MR. MASSEY WAS DRINKING

501. Plaintiff states that he asked the officers if they believed that Mr. Massey had been drinking.

502. Officer Surles told Plaintiff that he had been attended training on how to determine whether someone is drinking and that in his considered opinion, Mr. Massey had not had anything to drink.

503. Plaintiff admits that he does not know whether Mr. Massey was drinking or whether Mr. Massey was experiencing cognitive problems,

#### RYAN MARSHALL AND MARIE FOLZ RETURN TO MAYS PARK

504. Plaintiff states that as the officers were leaving, Marie Folz and Ryan Marshall returned, and that Marie Folz told Plaintiff she wanted to speak with the officers.

### THE OFFICERS MAKE A DRAMATIC TURNAROUND IN THEIR BEHAVIOR

505. Plaintiff states that the presence of Marie brought a most remarkable turnaround in the manner of the police officers:  namely they began to take on the manner of competent police officers.

506. Plaintiff states that, after speaking with Marie for a few minutes, Officer Surles told Marie that he was opening a case and asked Marie to write a statement.

507. The officers change in behavior indicates the really incredible bias that the Columbia Police Department has against Plaintiff.

508. Plaintiff states that he heard every word that Marie said to the officers and that what Marie said was materially the same as what he had said.

509. Plaintiff states that he asked the officers what information Marie had provided that Plaintiff had not provided.

510. Plaintiff states that when he asked Officer Surles what Marie had told him that Plaintiff had not already reported, Plaintiff believes that the body camera will confirm that that Marie reported nothing of material[9] value that Plaintiff had not already reported.

511. Plaintiff states that Ryan wrote a statement after being asked if he wanted to give a statement.

### THE OFFICERS DENY THAT THEY DELAYED IN RESPONDING

512. When Plaintiff asked the officers why they had delayed in responding to his call for help, both officers said that they responded immediately when the call came to them.

513. Plaintiff believes that their claim is true because it is consistent with what the 911 operator had told Plaintiff; namely, that the 911 center had notified Sgt. Brown of the call.

514. Plaintiff believes that if the officers responded immediately when the call came to them, then they were not occupied with another call when they received the call to go to Mays Park.

---

[9] By "material", Plaintiff means anything that would *matter* to, or change any opinion held by, a reasonable individual who had also heard from Plaintiff.

File: complaint 18 apr

515. Plaintiff believes that their reported immediate response suggests that they were available and could have reported to Mays Park earlier, had the call not been held.

### THE OFFICERS SHOW NO INTEREST IN A NEUTRAL WITNESS

516. Plaintiff states that the officers showed no interest in interviewing the neighbor, the mother who Mr. Massey told to leave before she got hurt. This witness lived right next door to where the officers were standing.

517. Plaintiff states that while Ryan and Marie were writing their statements, while Plaintiff was standing near the edge of the road speaking with Officer Seavey, the neighbor stopped her car as she was riding by and asked Plaintiff if he were OK. Though she had stopped within several feet of both Plaintiff and Officer Seavey, Officer Seavey had no interest in interviewing this witness.

518. Plaintiff believes that the official investigative policies and procedures of the Columbia Police Department requires that officers interview witnesses.

519. Plaintiff believes that Officer Seavey denied Plaintiff due process by not following the written policies and procedures of the Columbia Police Department.

520. Plaintiff asserts that had Officer Seavey interviewed this witness, she would have definitely confirmed that Mr. Massey and Mr. Massey alone was screaming.

521. Plaintiff believes that if Officer Seavey and Officer Surles had any interest in determining the truth, they would have interviewed this witness.

522. Plaintiff states that he laughed when Officer Surles finally got around to asking Plaintiff if Plaintiff cared to make a statement. Plaintiff declined because he had no interest in endorsing what he believed was a bogus investigation and because he believed that if the investigators had no interest in prosecuting Mr. Massey for AGGRAVATED ASSAULT, they certainly would have no interest in prosecuting Mr. Massey for screaming threats and obscenities.

523. Plaintiff states that Mr. Massey waited until the officers were ready to depart before making a surprise encore.

### MR. MASSEY CUSSES THE OFFICERS

524. Mr. Massey came outside and cussed out the police officers from his front yard. Plaintiff believes that the body cameras of the officers recorded Mr. Massey's cursing.

525. Plaintiff states that the officers took no action when Mr. Massey cussed at them.

526. Plaintiff believes that the officers of the Columbia Police Department generally arrest persons who cuss officers out.

527. Plaintiff realizes that if it is perfectly fine for Mr. Massey to cuss out two police officers, then it must also be perfectly fine with the Columbia Police Department for Mr. Massey to commit other crimes, including AGGRAVATED ASSAULT.

528. Plaintiff states that these two officers represented the Law, and that despite the way they treated Plaintiff, Plaintiff never cussed the two officers.

### Is Mr. Massey Above the Law?

529. In that, with complete impunity, Mr. Massey has committed AGGRAVATED ASSAULT, has made false statements to 911 operators, and been in league with the destruction of city property, Plaintiff believes that Mr. Massey may believe that he is above the law.

530. Plaintiff that the Columbia Police Department agrees that Mr. Massey is above the law.

531. Plaintiff believes the officers demonstrated clearly that equal protection does not exist in Columbia, SC

532. Plaintiff believes that Mr. Massey's cussing at the officers was entirely consistent with the behavior of Mr. Massey the entire evening.

533. Plaintiff believes that Mr. Massey's cussing at the officers is also entirely consistent with Mr. Massey's committing the felony of AGGRAVATED ASSAULT on 11 November 2020.

534. Plaintiff believes that anyone who cusses police officers out is not very likely to be of sound mind.

535. Plaintiff states that such an open display of contempt for the law demonstrates a level of hostility that could easily result in violence.

536. Plaintiff believes that a person who cusses out police officers is not only more likely to commit violent acts against others, but is also more likely to provoke against himself

537. Plaintiff believes that the profanity that Mr. Massey directed towards the officers confirmed everything that Plaintiff had reported to the Columbia Police Department.

538. Plaintiff believes that the officers knew all of the following:

    a. Mr. Massey had told one man's wife that she could be hurt,

    b. Mr. Massey had called another man's girlfriend obscene names,

File: complaint 18 apr

    c. Mr. Massey had stood outside shouting obscenities and threats at 3 people for more than 45 minutes, and that

    d. Mr. Massey had cussed out two police officers

539. Plaintiff believes that any single item in the above paragraph could result in very violent actions by Mr. Massey or against Mr. Massey.

540. Plaintiff believes that in canceling the call to have Mr. Massey examined by a psychiatrist, the officers showed remarkable indifference to the safety the citizens of Columbia, SC, which these officers are supposed to protect.

541. Plaintiff believes that Mr. Massey demonstrated very clearly to the officers that he was a threat to himself and to others.

542. Plaintiff notes that these are the same officers who Lt. Wilson said cancelled the call for the ambulance to transport Mr. Massey to a hospital where he could be interviewed by a psychiatrist.

543. Plaintiff finds it especially remarkable that Mr. Massey cussed the officers after

    a) the officers had accepted Mr. Massey's word as the gospel truth,

    b) the officers declared that Mr. Massey was completely sober,

    c) the officers cancelled the call for the ambulance to transport Mr. Massey to be interviewed by a psychiatrist,

    d) the police had totally ignored Plaintiff's 911 call for help,

    e) Officer Surles effectively endorsed Mr. Massey's threats against Plaintiff, and

    f) Officer Sewell instructed Plaintiff to never call 911 again.

544. Plaintiff believes that the actions and decisions of the Columbia Police Department on the evening of 17 December 2020 were based on the Columbia Police Department's perception of the social status of the parties and on improper and incorrect profiles that the Columbia Police Department apparently maintains on both Plaintiff and Ryan Marshall.

545. Plaintiff states that he first learned of these incorrect and improper profiles from Officer Leach on or about 8 July 2019.

546. Plaintiff believes that the Columbia Police Department acted in a manner that is entirely consistent with every other action and inaction that Plaintiff has described so far.

### OFFICER LEACH DETAINS PLAINTIFF AND RYAN MARSHALL IN JULY 2019

547. (This event is not presented in chronological order. This event occurred the week prior to Investigator Leach's appearance as the responding officer to Plaintiff's call for an officer regarding his flowers being pulled up.on—or about—12 July 2019.

File: complaint 18 apr

## SUMMARY

548. Plaintiff states that Officer Leach and three other officers detained Plaintiff and Ryan Marshall for over an hour for no legitimate reason on or about 8 July 2017.

549. Plaintiff believes that no crime had even been reported on the evening in question, but Columbia Police Department nevertheless showed greater interest in the Plaintiff and Ryan Marshall than the Department ever showed in David Massey or Summer Thompkins.

### THE SEARCH FOR AN INJURED, MISSING DOG

550. Plaintiff states that on or about 8 July 2019 Ryan Marshall called Plaintiff and asked told Plaintiff that one of his dogs had been struck by an automobile and that the dog was missing.

551. Plaintiff states that Ryan asked for Plaintiff's assistance in finding the missing dog, telling Plaintiff that he feared that the dog had slipped off to die, and that he believed it was very important to find the dog as soon as possible.

552. Plaintiff immediately drove to Ryan's residence at 4008 Kilbourne Road and assist in the search. Plaintiff brought with him the flashlights that Ryan asked him to bring.

553. Plaintiff and Ryan set out in Plaintiff's 1997 Honda Accord because Ryan's car, which was of much more recent vintage, was almost completely out of gas.

554. Plaintiff states that 4008 Kilbourne Road is around the corner from Mays Park and in the same exclusive area as David Massey's residence

555. Plaintiff believes that, if anything, Ryan Marshall's property at 4008 Kilbourne Road is more upscale, is in a more desirable location, and of greater value than David Massey's residence.

556. Plaintiff acknowledges that his 1997 Honda, which is a pretty beat up 1997 Honda, obviously seems out of place in that neighborhood.

557. Plaintiff also acknowledges that Columbia Police Department officers had a creditable reason to pull them over and to check them out.

### DISCO INFERNO

558. Plaintiff does not believe there was any need for the dramatics of the Columbia Police Department, which began when the blue lights of three police vehicles lit up the night it like it was disco inferno.

### THE SEARCHLIGHT

559. Officer Leach took their IDs and went back to his vehicle where he remained for at least 10 minutes while another officer walked around Plaintiff's vehicle

shining a very bright flashlight into the vehicle, including shining the light on Plaintiff and Ryan Marshall's person.

560. Even after Plaintiff told the officer that he would give him permission to search Plaintiff's vehicle, the officer continued to rudely point the flashlight into Plaintiff's car.

### THE RECORDS CHECK

561. Plaintiff assumes that Officer Leach searched the criminal records and determined that both Plaintiff and Ryan Marshall are both law abiding citizens.

### INTIMIDATION TACTICS

562. However, when Officer Leach returned, he directed both Plaintiff and Ryan Marshall to "get out of the vehicle and step forward", prompting Plaintiff to say to Ryan, "They are going to arrest us."

563. Plaintiff believes that the Columbia Police Department had no valid reason to use such intimidation tactics as the flashlight and the direction to "get out of the vehicle and step forward."

### SUSPECTED AUTOMOBILE BURGLARS

564. Although Plaintiff is certain that Officer Leach's query results indicated to him that Plaintiff and Ryan Marshall were law abiding citizens, Officer Leach reported that his query resulted in numerous hits indicating that both Plaintiff and Ryan Marshall were frequently seen in areas where there are numerous automobile have been broken into.

565. Plaintiff states that he has never broken into a car.

566. Plaintiff states that for the past 5 years he has been very familiar with the activities of Ryan Marshall and that he feels absolutely certain that Ryan Marshall has never broken into a car either.

567. Plaintiff states that the profiles that Officer Leach referenced are absurd and baseless.

568. Plaintiff states that at that time, he had a highly positive opinion of the Columbia Police Department and that he thought it was always best to cooperate with the police and help them do their job.

### THE SUSPICIONS OF THE OFFICERS

569. Officer Leach and the other two officers expressed doubt when Plaintiff told them that he and Ryan Marshall were searching for an injured dog.

570. Plaintiff states that as Plaintiff and Ryan Marshall continued to answer questions, the suspicions of the officers continued to grow.

### PLAINTIFF'S SUSPICIONS OF THE OFFICERS

571. Plaintiff began to suspect that the officers were incredibly obtuse and so he suggested that this matter could be very quickly cleared up if he and Ryan were separated to a distance where neither could hear the response of the other, and that they each be asked the same questions, to which, Plaintiff predicted, they would give the same answers, and this matter could be cleared up rapidly.

572. Plaintiff states that he was puzzled that the officers seemed to have absolutely no interest in clearing up this matter quickly.

573. Plaintiff continued to be puzzled when they kept attempting to poke holes in Plaintiff and Ryan's answers when he knew that they could have cleared things up in a couple of minutes by separating and questioning Plaintiff and Ryan.

574. Plaintiff and Ryan stuck to their story—their story was the truth, the whole truth, and nothing but the truth—and they continued to explain that they were looking for Ryan's dog, a dog that had run off when hit by a car.

575. When the officers asked Plaintiff why he was driving so slow, Plaintiff believed that they had just explained why he was driving so slow, but Plaintiff explained that they were looking for an injured dog and said, "Yes, I know I got down to 15 mph at some points."

### AN OFFICER OBJECTS TO PLAINTIFF'S CLAIM

576. "YOU WERE GOING 10 MILES PER HOUR," one officer responded, in a loud, accusatory tone, prompting Plaintiff to admit that he had not watched his speedometer the entire time.

577. All of the objections of the officers were along a similar line.

578. The officers asked why Ryan was shining a flashlight out of the passenger window. Plaintiff once again explained that they were looking for a dog.

579. Plaintiff states that the officers expressed disbelief about the reason for the flashlight.

580. Plaintiff states that the officers said that they suspected that Plaintiff and Ryan were riding around shining a flashlight at cars they were planning to break in.

581. Plaintiff states that he saw Ryan shine the flashlight only into dark corners of some yards. Plaintiff never saw Ryan shine the flashlight at a car.

582. Plaintiff states he was reminded of his previous estimation of these officers as being obtuse.

583. Plaintiff states that the officers explained that Plaintiff and Ryan Marshall that persons who broke into cars rode around shining flashlights out of a car

window just as Plaintiff and Ryan were doing, and that the officers suspected that we were looking for cars to break into.

584. Plaintiff did not believe and does not believe that thieves would be so incredibly obtuse as to ride around in an exclusive neighborhood in a 23 year old beat up automobile shining a flashlight into the windows of cars they planned to break into.

585. Officer Leach asked Plaintiff if Plaintiff would agree to permit the officers to search his car.

586. Even though Plaintiff knew that Officer Leach not only had no probably cause to search his vehicle, at that time Plaintiff believed that it was his duty to help the police in their work, and so he agreed.

587. Plaintiff does not believe that Officer Leach had any reasonable suspicions.

### OFFICER LEACH AND PLAINTIFF INTENTION TO GET HONEST WITH EACH OTHER

588. Plaintiff states that as the two other officers began the search, Officer Leach said, "I am going to be honest with you guys . . . ", Plaintiff had had enough of this nonsense and interrupted Officer Leach saying, "No, I am going to be honest with you . . ."

589. At that point that Plaintiff, Ryan interrupted Plaintiff and told Plaintiff that Plaintiff was displaying bad manners.  Ryan told Plaintiff that did not approve of the Plaintiff's manner because Officer Leach was a whole lot nicer than any of the other officers who had harassed him in that area when he walked his dogs, which also happens to be the exact same area where Ryan lives.[10]

590. Plaintiff states that Officer Leach never got around to telling them what he was going to be honest with them about, but that Officer Leach began to treat Plaintiff and Ryan Marshall in a much more appropriate manner after Plaintiff had interrupted Officer Leach by stating his intention to be honest.

### DETAINED FOR MORE THAN ONE HOUR

591. Plaintiff states that Officer Leach held them for more than 1 hour before letting them go.

592. Plaintiff states that this stop never made any sense at all to him until 17 December 2020.

### OFFICER SURLES CLEARS THINGS UP

593. Plaintiff states everything became perfectly clear to him after Officer Surles explained to Plaintiff—on that Plaintiff had no business in the area of Mays Park.

---

[10] Ryan Marshall has told Plaintiff that he is frequently harassed by the Columbia Police Department when walking his dogs in the neighborhood he lives in.

594. On 17 December 2020, Plaintiff came to realize that the policy of the Columbia Police Department is to *harass* persons they believe be in an area that the Columbia Police Department believes to beyond those persons socioeconomic class.

595. Plaintiff believes that such harassment based on profiling that, like racial programming, is based on physical appearance only, and that this profiling result in a person being harassed when the person is in an area that the Columbia Police Department believes to be beyond that person's socioeconomic status.

596. After hearing what Officer Surles said to Plaintiff on 17 December 2020, Plaintiff came to see that Officer Leach and the other officers were not conducting an investigation at all, but that they were conducting an exercise in threats, intimidation, and harassment.

597. Plaintiff believes that the conduct of the officers was based on the outward appearances of Plaintiff and Ryan Marshall and consistent with what could be expected to result from racial profiling.

598. Plaintiff believes that this profiling is, in fact, racial profiling that includes some white persons and probably excludes some African Americans.

599. Plaintiff believes that this profiling results in harassment that is very similar, even identical, to racial harassment.

600. Plaintiff believes that such harassment is mostly along racial lines, but that the police will include white persons who appear to them to be outsiders.

601. Plaintiff came to see that Officer Leach shared the opinion of Officer Surles that Plaintiff was in an area beyond what Plaintiff's socioeconomic class justified, and so threats and harassment were called for.

602. Plaintiff also believes that Officer Leach is aware, or should be aware, that such harassment is a violation of the U.S. Constitution and other federal law.

603. Plaintiff believes that Officer Leach was following the official policy of the Columbia Police Department when he detained and harassed Plaintiff and Ryan Marshall.

### "HE SAID, SHE SAID"

604. On 11 November 2020, when Ryan Marshall asked Officer Leach why he was not going to investigate Summer Thompkins' vandalism, Officer Leach said that it was a case of "he said, she said". Officer Leach stated it was a case of one person's word against another person's.

605. At that point Plaintiff reminded Officer Leach that even when there was no dispute about who did what—even when the perpetrator has admitted she did the deed to Officer Leach, Officer Leach still refused to prosecute.

606. Officer Leach did not need to be reminded that Plaintiff was referencing an incident that occurred on 12 July 2019, only 4 days or so after Officer Leach's detainment of Plaintiff and Ryan Marshall.

# COUNT ONE: DENIAL OF DUE PROCESS

607. Plaintiff asks the Court to include all paragraphs above this paragraph as incorporated into this section of the Complaint

608. Plaintiff states that the Columbia Police Department has *repeatedly* and *consistently* denied Plaintiff's right to due process on multiple occasions since 2015.

609. Plaintiff believes that the Columbia Police Department had both denied Plaintiff due process due to gross negligence, willful disregard pf the and by conspiracy.

610. Plaintiff alleges that defendants denied Plaintiff due process by acting in concert with Brenda Padgett and permitting her to continue to impose her vicious nature and destructiveness on Plaintiff by

a. Failing to acknowledge and to investigate Plaintiff's complaints, even as she admitted to police that she had committed the acts Plaintiff complained of,
b. Failing to report and to record Plaintiff's complaints accurately and objectively,
c. Failing to learn the law,
d. Failing to provide reasonable police protection,

611. Plaintiff believes that the failure of the Columbia Police Department to express disapproval of her crimes amounts to tacit approval, and that the tacit approval of the Columbia Police Department affirmatively enhanced her destructiveness.

612. Plaintiff believes that the repeated, sustained inaction of the Columbia Police Department in the face of her ongoing destructive acts equals giving Brenda Padgett prior assurances that the police would not take action.

613. Plaintiff believes that the effectively prearranged sanction of her destructive acts violates Plaintiff's rights under the due process clause.

614. Plaintiff believes that the Columbia Police Department has denied him due process by refusing to maintain a record of Brenda Padgett's criminal actions. Plaintiff believes that had a record been maintained, Plaintiff would have not continued, even to this day, to be denied due process.

615. Plaintiff believes that the Columbia Police Department denied Plaintiff due process by effectively conducting trials in the field and reaching conclusions that Plaintiff believes should have been reserved by the court.

616. Plaintiff believes that the Columbia Police Department has denied Plaintiff due process by willfully and deliberately refusing to conduct a single investigation at all regarding any of the events described herein. Alternatively, if any investigation at all has been conducted, Plaintiff believes that the Columbia Police Department had denied Plaintiff due process by willfully and deliberately conducting improper and inadequate investigations that are absolutely not in accordance with the Columbia Police Department's written policies and procedures.

617. Plaintiff maintains that official reports, when they exist, invariably endorse and state the sometimes bizarre claims of the opposing party as if these bizarre claims were uncontested fact, without having been investigated at all, including both claims that are unbelievable on the face of it, and including claims that could be quickly and easily disproved. For example,

   a) Officer Leach's report on 12 July 2019 endorses the incredible claim that Brenda cut down Plaintiff's flowers to make the yard look better. Plaintiff maintains that this bizarre claim is unbelievable on the face of it. Yet it was endorsed by Officer Leach, Sgt. Baire and Sgt Baire's superior. Yet the Columbia Police Department holds Plaintiff—not Brenda Padgett—100% responsible for the maintenance of 100% the yard. In 2018 Plaintiff was cited by Officer Stacy Harris regarding the front yard of 3021 Kline Street, and Plaintiff, not Brenda Padgett, took the corrective action that Officer Harris required.

   b) Officers Surles report endorses Mr. Massey's claim that Plaintiff had been screaming at them in the 45 minutes before the officers arrived. Plaintiff had found the Columbia Police Department to be so predictable that he stayed on the phone with 911 operators for the sole purpose of being able to disprove this claim. Besides the recordings of the 911 calls, the Columbia Police Department could have disproved, or at least brought Mr. Massey's claim into doubt by interviewing the neighbor who had witnessed Mr. Massey's monologue.

618. Plaintiff believes that Officer Surles explicit official sanction of Mr. Massey's violent intentions equals a due process violation.

619. Plaintiff believes that the Columbia Police Department's implicitly and explicitly endorsed the crimes that both Brenda Padgett and David Massey committed against Plaintiff, and therefore encouraged further crimes.

620. Plaintiff believes that the Columbia Police Department has denied him due process by deliberately refusing to confer with prosecutors at all regarding any incident described herein.  Alternatively, Plaintiff believes that if the Columbia Police Department has conferred with prosecutors at all, Plaintiff believes that the Columbia Police Department withheld material information that would have changed an opinion of the prosecutor.

621. The Columbia Police Department has not just denied Plaintiff due process on occasion:  Plaintiff states that the Columbia Police Department had denied Plaintiff due process on every occasion.

## COUNT TWO: DENIAL OF EQUAL PROTECTION

622. Plaintiff asks the Court to include all paragraphs above this paragraph as incorporated into this section of the Complaint

623. Plaintiff believes that the right to equal protection includes the right to call 911 and the right to a response from the police.  Plaintiff claims that the Columbia Police Department has told Plaintiff on two occasions that he should not call 911.  This directive not to call 911 is the equivalent of telling Plaintiff that he has absolutely no police protection.  Plaintiff was first told not to call 911 by Officer Leach in August 2019 and by Officer Sewell on 17 December 2020.  Plaintiff states that these officers had no valid reason to direct Plaintiff to not call 911.  (Plaintiff acknowledges that Officer Sewell did retract his directive to Plaintiff not to call 911 later on the very evening that he directed Plaintiff not to call 911, but this retraction occurred only after Officer Seavey discovered that Plaintiff was not quite as disenfranchised and not quite as low on the socioeconomic totem pole as Officer Seavey and Officer Surles had apparently believed he was.

624. Plaintiff maintains that the Columbia Police Department has not only directed Plaintiff not to call 911, but Plaintiff states that he expects to prove beyond any doubt that the Columbia Police Department *deliberately ignored* Plaintiff and Marie Folz's 911 calls on 17 December 2020.  Plaintiff believes that deliberately ignoring a 911 call goes beyond denying equal protection: Plaintiff believes that ignoring a 911 call is a denial of any protection at all. Plaintiff believes that when Officer Surles and Officer Seavey arrived at Mays Park on the evening of 17 December 2020, they were responding to a call from the EMTs for the police, and not from Plaintiff and Marie Folz's calls. Plaintiff states that he was told, or when it was suggested to him, by the 911 operator that the shift supervisor had held Plaintiff's 911 call.  The 911 operator identified the shift leader as Sgt Brown.  Plaintiff believes that *Sgt Brown's deliberate refusal to respond to Plaintiff and Marie Folz's 911 calls was endorsed, or perhaps ordered by, a supervisor, or supervisors,* who are

the same persons who set the official policies and procedures of the Columbia Police Department. Plaintiff believes that it was the official policy of the Columbia Police Department on 17 December 2020 to ignore 911 calls from Plaintiff. Plaintiff believes that it may still be the Columbia Police Department's policy to ignore 911 calls from Plaintiff.

625. Plaintiff believes that Investigator Seay denied Plaintiff equal protection as well as due process by willfully refusing to conduct an investigation of the AGGRAVATED ASSAULT against Plaintiff and Ryan Marshall. Incredibly, Investigator Seay even asked Plaintiff who Ryan Marshall was, which Plaintiff believes revealed that Investigator Seay never even watched the video. Investigator Seay also never contacted, or even tried to contact, Ryan Marshall.

626. Officer Leach and Officer Surles directed Plaintiff to play tennis at other courts besides Mays Park. Plaintiff believes that this direction means that Plaintiff has no police protection at Mays Park.

627. The Columbia Police Department has consistently, and over the course of at least several years, absolutely and emphatically refused to protect Plaintiff's rights as the sole owner of 3019-3021 Kline Street in regards to front yard.+. Plaintiff notes that the Columbia Police Department has specifically held Plaintiff responsible for the upkeep of the front yard on the 3021 side of the yard, yet the Columbia Police Department denies Plaintiff's ownership rights to the extent that the Columbia Police Department has endorsed the crimes that Brenda Padgett has committed by destroying flowering plants that Plaintiff planted on that side of the property.

628. Plaintiff believes that the Columbia Police Department has deprived Plaintiff of equal protection by actively endorsing Brenda Padgett's criminal destruction of flowers that Plaintiff has planted in all areas of the property at 3019-3021 Kline Street.

629. Plaintiff believes that the Columbia Police Department has deprived Plaintiff of his rights as the owner of 3019-3021 Kline Street by willfully refusing to learn the law regarding Plaintiff's rights as owner of the property.

630. Plaintiff finds it very curious that Columbia Police Department Ordinance Division Enforcement Officer Stacy Harris is aware of Plaintiff's ownership responsibilities regarding the entire front yard at 3019-3021 Kline Street, but the Columbia Police Department Law Enforcement division is absolutely clueless about Plaintiff's ownership rights.

631. Not only is the Law Enforcement Division absolutely clueless, but *the Law Enforcement Division even admits to being absolute clueless in regards to Plaintiff's ownership rights.*

632.

File: complaint 18 apr

633. Plaintiff believes that a reasonable view of the undisputed facts strongly supports the inference that Defendants' actions rise to the level of affirmative conduct that creates or increases the risk of crime, including violent crime, against the Plaintiff.

634. Plaintiff believes that due process violations occurred because the Defendants actually contributed to the vulnerability of the Plaintiff.

635. Plaintiff believes that both Brenda Padgett and David Massey were aware of the dismissive attitude toward Plaintiff's complaints, and such awareness nullifies the deterrent capacity of police response.

### LIABILITY

636. Plaintiff expects to demonstrate the liability of the Columbia Police Department using videos and recordings created by the Columbia Police Department.

637. Plaintiff believes that the videos and recordings will demonstrate that Plaintiff has neither added to what is recorded nor subtracted any material fact from the recordings.

638. Plaintiff believes that the videos and recordings will demonstrate that Plaintiff has not taken anything out of context.

639. Plaintiff believes that these videos and recordings will demonstrate not only by a preponderance of evidence but also beyond a reasonable doubt that the Columbia Police Department has deliberately and willfully denied equal protection and due process to Plaintiff on a number of occasions.

640. Plaintiff believes that the individual officers were following the instructions of their supervisors in all instances and that the behavior and actions of the individual officers represents the official policy of the Columbia Police Department.

641. Plaintiff does not believe that the Nuremburg Defense applies here any more than the Nuremburg Defense applied at Nuremburg. Plaintiff states that though he believes that the individual officers were following either (1) orders from their superiors or (2) official policies and procedures, Plaintiff maintains that each of these officers either knew better or should have known better than to follow these orders or policies, and so Plaintiff does not believe that the Nuremburg Defense is applicable.

642. Plaintiff believes that both the supervisors and the individual officers were aware that they were acting against the United States Constitution.

# PLAINTIFF'S REQUESTS TO THE COURT

### JURY TRIAL

643. Plaintiff requests a speedy trial by jury

### REIMBURSEMENT OF COSTS

644. Plaintiff requests that the Court order the Defendants to reimburse all costs incurred by the Plaintiff.

### COMPENSATION FOR PLAINTIFF'S TIME

645. Plaintiff has had to pursue this matter with his own time, Plaintiff asks the Court to order Defendants to compensate Plaintiff for his time at a rate of $35 an hour, or at 20% of the average per hour fee for attorneys in Columbia, SC

### ACTUAL DAMAGES

646. Plaintiff asked the Court to order Defendants to pay actual damages. However, Plaintiff's interest in the amount awarded is minimal.

647. Plaintiff files this suit much more in the interest of preventing future damages than for the purposes of receiving monetary compensation for past damages.

648. Plaintiff has not only paid 100% of the property taxes levied against 3019-3021 Kline Street, but the Columbia Police Department Ordinance Division has also held Plaintiff responsible for the upkeep of 100% of the outdoor property. Yet the Columbia Police Department refuses to acknowledge or to enforce Plaintiff's rights as owner of the property. Plaintiff asked that the Defendants be ordered to reimburse Plaintiff for all property taxes that Plaintiff has paid for the 3 years prior to filing, or, if applicable, along with a pro rata portion of the property taxes post filing until such times as the Columbia Police Department acknowledges Plaintiff's rights as the sole owner of 3019-3021 Kline St. and enforces Plaintiff's rights as the owner of the property. Plaintiff states that property taxes are approximately $2,500 per year.

649. Plaintiff has experienced mental suffering as a result of

   a) being forced to pay taxes on property that the Columbia Police Department denies his right of ownership,
   b) being forced to maintain the outdoor areas while his ownership rights have been denied,
   c) the ongoing criminal acts of Brenda Padgett against Plaintiff which the Columbia Police Department has both condoned and endorsed.

File: complaint 18 apr

d) the failure of the Columbia Police Department to properly investigate the crime of AGGRAVATED ASSAULT committed by David Massey against Plaintiff,

e) being told on two occasions by the Columbia Police Department that Plaintiff should not call 911,

f) the Columbia Police Department's ignoring of Plaintiff's 911 call on 17 December 2020,

g) the Columbia Police Department's ongoing willful and deliberate refusal to provide Plaintiff with police protection,

h) the Columbia Police Department's ongoing willful and deliberate refusal to provide due process to Plaintiff.

650. Plaintiff states that the actual damages regarding Plaintiff's mental suffering are impossible for Plaintiff to access. Plaintiff states that it would take a sum of much more than $5,000 to properly compensate Plaintiff for mental suffering, but Plaintiff limits his request to a sum of $1,000.

651. Plaintiff asks the Court to award Plaintiff an amount that the Court believes is fair and equitable to all parties.

## PUNITIVE DAMAGES

652. Plaintiff believes that each act described herein is morally reprehensible and were motivated by an evil motive or intent, or that it involved a reckless or callous indifference to the federally protected rights of others. Plaintiff asks for punitive damages of an amount deemed equitable by the Court in order to punish the Defendants for their outrageous conduct and to deter them and others like them from similar conduct in the future.

## INJUNCTIVE RELIEF

653. Plaintiff files this suit much more to prevent future damages than to recover actual damages, and so Plaintiff requests such injunctive relief as the Court deems proper in order to correct, or at least to ameliorate the problems in the functioning of the Columbia Police

654. Plaintiff requests that the Court expressly order the Columbia Police Department to follow all law that applies to the Columbia Police Department, including the United States Constitution, and all law that the Columbia Police Department is charged with enforcing and with following.

655. Plaintiff asks that the Court order the Columbia Police Department to either design a program to properly train all employees working in law enforcement about the U.S. Constitution, including the Bill of Rights, and that the Columbia Police Department submit the plan to the Court, or to the Court's designee, for approval within 3 months of the date of the order.

656. Plaintiff asked that the Court order the require the Columbia Police Department to put all officers through the training mentioned in the above paragraph within one year, or within a time deemed equitable by the Court. Plaintiff requests that the order require the Columbia Police Department to report monthly on this training process to the Court or to the Court's designee.

657. Plaintiff asks that the Court order the Columbia Police Department's training program to specifically include training regarding how the Nuremburg Defense applies and does not apply to police officers in the United States.

658. Plaintiff requests that the Court specifically order the Columbia Police Department to enforce all of Plaintiff's legal rights that the law requires that it protect in the future, specifically mentioning Plaintiff's right to equal protection and Plaintiff's right to due process.

659. Plaintiff requests that the Court order the Columbia Police Department to consult with a qualified attorney regarding Plaintiff's rights as the owner of 3019-3021 Kline Street, and that the Columbia Police Department enforce Plaintiff's legal rights as the owner of the property.

660. Plaintiff requests that the Court order the City Council and the City Manager to develop a plan for monitoring the Columbia Police Department regarding compliance with the Orders of this Court within 3 months of the date of the Court's order and to report its findings to the Court, or to the Court's designee, on a semi-annual basis for the 5 years following the date of the Court's order, with the 5 year period renewable at the Court's discretion.

661. Plaintiff requests that the Columbia Police Department be ordered to properly investigate the crime of AGGRAVATED ASSAULT which Plaintiff contends that David Massey committed and to report its findings in writing to the Court within 30 days of the date of the Order.

662. Plaintiff requests that the Court order the Columbia Police Department to properly investigate the crime that Summer Thompkins is creditably alleged to have committed; namely, destruction of city property. Plaintiff requests that the Court order the Columbia Police Department to report its findings to the Court within 30 days of the date of the order.

663. Plaintiff asks the Court for declaratory judgment stating that the Columbia Police Department has violated Plaintiff's constitutional rights, including Plaintiff's right to due process and to equal protection.

## ADDITIONAL RELIEF

664. Plaintiff asks for any additional relief that the Court may consider to be fair and equitable to all parties.

File: complaint 18 apr

## Plaintiff's Representations

Under the Federal Rule of Civil Procedure 11, by signing below, I certify that tot the best of my knowledge, information and belief that this complaint (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the costs of litigation; (2) is supported by existing law or by nonfrivolous argument before extending, modifying, or reversing existing law; (3) the factual contentions, for the most part, have evidentiary support or, if so specifically identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

Plaintiff agrees to provide the Clerk's office with any changes to my address where case-related papers may be served. Plaintiff understands that his failure to keep a current address on file with the Clerk's Office may result in dismissal of his case.

**`I verify under penalty of perjury that the foregoing is true and correct.**



John David Padgett, Plaintiff
3019 Kline Street
Columbia, SC 29205
cowdaddy@icloud.com
803.960.8855


Date of signing: 19 April 2021

File: complaint 18 apr